Emily THOMAS, Plaintiff–Appellee,
Cross–Appellant,

v.

CINCINNATI BOARD OF EDUCATION,
Defendant–Appellant, Cross–Appellee.

Nos. 89–3546, 89–3597.

United States Court of Appeals,
Sixth Circuit.

Argued March 3, 1990.

Decided Nov. 6, 1990.

Michael J. Mooney (argued), Cincinnati, Ohio, for plaintiff-appellee, cross-appellant.

Joseph J. Dehner (argued), Phyllis E. Brown, Frost & Jacobs, Cincinnati, Ohio, for defendant-appellant, cross-appellee.

Before KENNEDY and NORRIS, Circuit Judges; and GADOLA, District Judge.[*]

ALAN E. NORRIS, Circuit Judge.

Defendant Cincinnati Board of Education ("CBE"), and plaintiff, Emily Thomas through her mother Roxanne Thomas, appeal from the judgment of the district court in this case arising under the Education for All Handicapped Children Act. The CBE appeals the district court's order granting Thomas' motion for summary judgment and challenges the court's conclusion (1) that it developed an individualized educational program ("IEP") in violation of the Act's procedural safeguards, (2) that Ohio law reserves home instruction for those children who are unable to attend or to be transported to school, and (3) that school-based education is the only appropriate educational placement for Emily. Although Mrs. Thomas urges this court to affirm the district court's decision, she nevertheless cross-appeals, arguing that the court erred by failing to award compensatory educational services to make up for the period in which the CBE allegedly deprived Emily of the free appropriate education to which she is statutorily entitled. For the reasons set forth below, we reverse the district court and remand with instructions to enter summary judgment in favor of the CBE.

I.

The Education for All Handicapped Children Act ("EAHCA" or "the Act"), 20 U.S.C. § 1401 *et seq.*, was passed in 1975 in response to a congressional determination that handicapped children were not being properly educated and were, in most instances, excluded from the classroom.[1] Congress concluded that the problem was the result not only of financial constraints at state and local levels but was also due to state and local laws which enabled school districts to exclude children without consultation with their parents. Accordingly, a remedial statute which simply would assist with funding was deemed inadequate. Instead, Congress enacted legislation which

[*] The Honorable Paul V. Gadola, United States District Judge for the Eastern District of Michigan, sitting by designation.

1. *See* H.R.Rep. 332, 94th Cong., 1st Sess. 2 (1975), in which Congress succinctly articulated its perception of the problem: A majority of handicapped children in the United States "were either totally excluded from schools or [were] sitting idly in regular classrooms awaiting the time when they were old enough to 'drop out.'"

grants disabled students the substantive right to a free appropriate public education in participating states, and conditions federal financial assistance upon compliance with the Act. *Honig v. Doe,* 484 U.S. 305, 310, 108 S.Ct. 592, 597, 98 L.Ed.2d 686 (1988).

In order to qualify for federal funds, state and local agencies are bound to federal guidelines delineating identification and placement of handicapped children. In addition, because the Act incorporates state law pertaining to educational rights of handicapped children, local schools must also comply with state standards. Thus, even if a school district complies with federal law, it may still violate the Act if it fails to satisfy more extensive state protections that may also be in place.[2]

The Act adopts a "zero reject" principle which brings within its protective ambit a wide range of handicapped children who require special education and related services.[3] The substantive cornerstone of the Act is the provision that all handicapped are assured the "right to a free appropriate public education"[4] which is comprised of "specially designed instruction, at no cost to parents or guardians, to meet the unique needs of a handicapped child, including classroom instruction, instruction in physical education, home instruction, and instruction in hospitals and institutions" as well as "related services" ("transportation, and such developmental, corrective, and other supportive services ... as may be required to assist a handicapped child to benefit from special education"). Although the "free appropriate education" provision only assures handicapped children a limited level of services,[5] the Act provides this guarantee unconditionally. School districts which fail to comply, therefore, are not afforded significant leeway in asserting defenses based on a child's lack of conventional academic ability or the high cost of necessary services.

The primary vehicle through which handicapped children are assured a free appropriate public education is the "individualized education program." 20 U.S.C. § 1401(18). The IEP is a written statement prepared as the result of consultation among a representative of the local educational agency, the teacher, and the parents, which must contain, whenever appropriate

(A) a statement of the present levels of educational performance of such child, (B) a statement of annual goals, including short-term instructional objectives, (C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs, (D) the projected date for initiation and anticipated duration of such services, and (E) appropriate objective criteria and evaluation procedures and schedules for determining, on an at least annual basis, whether instructional objectives are being achieved.

20 U.S.C. § 1401(19). The IEP must be reviewed not less than annually, and must be revised when appropriate. 20 U.S.C. § 1414(a)(5).

In addition to the Act's substantive provisions, parents are also afforded significant procedural protections. They have the right to examine all relevant documents with respect to their child's education. 20

---

**2.** *See David D. v. Dartmouth School Committee,* 775 F.2d 411, 419–20 (1st Cir.1985), *cert. denied,* 475 U.S. 1140, 106 S.Ct. 1790, 90 L.Ed.2d 336 (1986); *Geis v. Board of Educ. of Parsippany–Troy Hills,* 774 F.2d 575 (3d Cir.1985).

**3.** 20 U.S.C. § 1401(1).

**4.** 20 U.S.C. § 1412(1).

**5.** In *Doe v. Smith,* 879 F.2d 1340, 1341 (6th Cir.1989), we recognized that "[w]hile, in order to be 'appropriate,' the educational benefits provided by the states must be more than *de minimus, Polk v. Central Susquehanna Intermediate*

Unit 16, 853 F.2d 171, 182 (3d Cir.1988), *cert. denied,* 488 U.S. 1030, 109 S.Ct. 838, 102 L.Ed.2d 970 (1989), they need not maximize the potential of each handicapped child commensurate with the opportunity provided nonhandicapped children." (Citing *Board of Educ. v. Rowley,* 458 U.S. 176, 204 n. 26, 102 S.Ct. 3034, 3049 n. 26, 73 L.Ed.2d 690 (1982)). Rather, "[t]he standard is satisfied 'by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *Smith,* 879 F.2d at 1341 (citing *Rowley,* 458 U.S. at 203, 102 S.Ct. at 3049).

U.S.C. § 1415(b)(1)(A). They must be notified of any proposed changes in the identification, evaluation, or educational placement of the child. 20 U.S.C. § 1415(b)(1)(C). Parents who have a complaint with their child's IEP must be given the opportunity to present their complaint at an impartial due process hearing before a state or local educational agency as determined by state law. 20 U.S.C. § 1415(b)(2). If the parents still find themselves aggrieved, they may bring an action in the United States District Court. 20 U.S.C. § 1415(e)(2). Finally, and most important to this case, the Act provides that "[d]uring the pendency of any proceedings ... unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement of such child." 20 U.S.C. § 1415(e)(3).

## II.

Emily Thomas is a severely retarded, multi-handicapped eleven year-old child who is confined to a wheelchair. Emily was born with Pierre–Robin syndrome; the symptoms of the syndrome include a bilateral cleft palate and micrognathia. At the age of two, Emily suffered an anoxic insult which deprived her body of oxygen for approximately thirty minutes. As a result of this oxygen deprivation, Emily sustained severe brain damage.

On September 12, 1984, the Cincinnati Center for Developmental Disorders ("CCDD") completed a diagnostic evaluation which summarized Emily's condition. Emily has severe psychomotor retardation and functions at no better than a one-month level developmentally. She has no self-help skills. Although she has minimal visual awareness, is legally blind and has borderline hearing loss, she does respond to some auditory stimuli and tactile stimulation. Emily has a seizure disorder which is presently controlled with phenobarbital. Because of multiple complications from her Pierre–Robin syndrome, she suffers from severe feeding problems and must use a gastrostomy tube. Finally, Emily must breathe through a tracheostomy which requires constant monitoring and suctioning.

Despite this pessimistic assessment, the evaluating physician concluded that the one hour of home training per week which Emily received was insufficient to meet her needs. He reasoned that although the Hamilton County Board of Mental Retardation and Developmental Disorders ("HCBMR/DD"), the agency responsible for Emily's education, was supposed to provide home education one day per week, frequent difficulties interfered with this schedule and, in practice, Emily only received home education once every two weeks. Therefore, he recommended enrolling her in a small, self-contained, special education program for the severely and profoundly retarded.

Following the CCDD's evaluation, Mrs. Thomas met with the following personnel on September 19, 1984 in order to develop an IEP for Emily: Dr. Nancy Tolley, a psychologist representing the Cincinnati Public Schools ("CPS"), Dr. William Russ, Associate Director of Special Education for the CBE, Dr. Anna Byrne–Jandacek, a consultant in special education at the CCDD, and Bernadine Kessinger, Director of Services for Children at HCMBR/DD. Based upon the information available to them—CCDD educational and psychological evaluations, an independent psychological evaluation conducted by Dr. Tolley, a report from the home instructor who had been working with Emily and a 1983–84 IEP—the group unanimously decided that the appropriate and least restrictive educational placement for Emily would be the Sensory Motor Integration Program ("SMI") at the Bobbie Fairfax School operated by HCBMR/DD. The program consists of a teacher and several aids who work with a small number of children requiring intensive stimulation of their motor and sensory development. It includes occupational, physical, speech, and language therapy. In addition, a nurse is available to dispense medication and provide specialized medical care.

While CPS and HCBMR/DD officials were preparing to implement the IEP, two

unforeseen circumstances intervened. First, a dispute arose between the CPS and the HCBMR/DD regarding the cost of transporting Emily to school. The only safe way in which she could be transported in view of the severity of her condition was by ambulance. Plaintiff contends that this was the real issue underlying the conflict. The CBE claims that safety, not cost, motivated the dispute and that regardless of the cost, its primary concern was Emily's ability to withstand the daily trauma of transportation followed by a full day of classroom education. Supporting the CBE's contention is the testimony of several members of the original IEP panel who continued to have, despite their initial recommendation that Emily would best be served by the SMI program, serious reservations about Emily's ability to tolerate five and one-half hours of sensory motor integration. For example, Bernadine Kessinger changed her assessment and concluded that Emily could not tolerate the school-based program, after having visited with Emily at home in the company of a nurse and a teacher from the Bobbie Fairfax School. Emily's mother agreed that Emily could continue to be served on supportive home service on an interim basis, while these concerns were being worked out.

The second intervening circumstance occurred while several IEP members were reconsidering their assessment of Emily's condition and ability to tolerate the school-based educational program. Due to a change in state funding regulations, the CPS was able to provide Emily with one hour of home instruction per day. Dr. Tolley explained that her original recommendation was based upon the only two options available at the time of the original IEP conference—one hour of home instruction per week or the school-based SMI program. However, had this new option been available, she said, this certainly would have been the most appropriate placement because it provided Emily with the benefit of additional services while avoiding the possibility of subjecting her to an intolerable level of stimulation.

Similarly, Dr. Russ testified that although he concurred with the original placement because he felt that one hour of home instruction per week was insufficient, he had serious doubts about Emily's ability to benefit from being placed outside her home. He went along with the SMI program, he said, despite his unfamiliarity with it, not because it would benefit Emily but because he sympathized with her mother and felt she needed assistance. In response to a question about why he did what he did, Dr. Russ answered:

"Everybody sees themselves as a child advocate. I don't have a full knowledge of what an SMI program was. I was trying to help mother, you know, she comes in, she's obviously very pregnant and she's got a lot of problems, and she needs some help with Emily, and we're going to try and help Emily any way we can. We went beyond what was good judgment for a lot of reasons."

In January 1985, Mrs. Thomas was contacted by telephone in order to set up an IEP status conference. She declined to set an immediate date, claiming that in order to review Emily's records adequately she needed more time. She was contacted in February, again by telephone, and responded that she still had not reviewed the records. Eventually, she agreed to schedule a meeting for April 22, 1985.

Seven months after the IEP was to have been implemented, then, the IEP team conducted a review conference with Emily's mother in attendance. The result of this conference was a revised IEP according to which Emily would remain on home instruction rather than being placed in the SMI program. Soon thereafter, in accordance with the changes in state funding regulations, the CPS began providing Emily with home instruction one hour per day, five days a week.

As was her right under section 1415(b)(2) of the Act, Mrs. Thomas requested a hearing with an impartial hearing officer ("IHO"). On December 4, 5, and 6, 1985, an IHO heard testimony from various experts. Four of the five experts who testified (Drs. Thomas M. Stephen, Russ, Tol-

ley, and Bernadine Kessinger) concluded that, in their opinion, home-based instruction was the most appropriate placement for Emily. Dr. Anna Byrne–Jandacek, testifying on behalf of plaintiff, stated that although either placement would be appropriate, Emily would receive a greater educational benefit from being in the classroom which was "an optimum situation" that was "worth a try."

On February 24, 1986, the IHO issued a decision in which he recognized that although the 1984 IEP could be implemented through either the school-based program or the home instruction with increased hours, the school-based program was more advantageous and, therefore, the appropriate educational placement. In arriving at this conclusion, the IHO considered both the concept of, "a continuum of alternative placements" and the definition of home instruction under the relevant Ohio regulation, section 3301–01–51–03(E)(1)(a) of the Ohio Administrative Code.[6] The IHO further reasoned that Emily's condition did not prevent her from being safely transported to school and, therefore, home education, by definition, was not an available option. Accordingly, the IHO ordered the school board to implement the school-based education provision of the IEP. However, he did concede that he had reservations about Emily's ability to tolerate the daily strain of travel and instruction and recommended modifying the IEP if it were subsequently determined that Emily could not tolerate the program.

The CBE appealed this decision to a State Level Reviewing Officer ("SLRO") pursuant to Ohio Rev.Code § 3323.05(F). In a decision issued on September 16, 1987, the SLRO reversed the IHO's decision. The SLRO concluded that the IHO erred in deciding that home instruction is foreclosed as a matter of law before deciding whether the evidence supported the conclusion that home-based education was an appropriate placement at all. After reviewing the evidence and making an independent evaluation, the SLRO determined that the mod-

ified IEP was an appropriate placement. Therefore, she concluded, section 3301–05–51–03(E)(1)(a) was irrelevant.

In addition, the SLRO decided that plaintiff's cross-appeal, in which it was asserted that the school board violated procedural safeguards of the Act, could not proceed because the claim had been waived by failure to assert it at the impartial hearing. The SLRO also held that even if the claim had not been waived, procedural safeguards had not been violated.

On appeal, the district court reversed the SLRO's decision, granting summary judgment in favor of plaintiff. The district court concluded that the school board violated procedural protections contained in both the Act and Ohio law and that Ohio law reserved home instruction for students who are unable to attend school. It further concluded that since Emily could be safely transported by ambulance, home instruction was unavailable as an option, and the school-based instruction outlined in the original IEP, therefore, was the least restrictive and appropriate placement.

Although Mrs. Thomas asked the district court to award compensatory educational services to make up for the time that Emily was deprived of her free appropriate education, the court demurred.

On appeal, the CBE contends that the district court erred in three respects: first, by concluding that it violated the Act's procedural safeguards; second, by construing Ohio law to limit home education to those students who are incapable of being transported to school; and third, by concluding that home education does not provide Emily with the free appropriate education to which she is entitled. In her cross-appeal, Mrs. Thomas argues that an equitable award of compensatory education (six years of education during summer vacations and an extension of the CBE's obligation to Emily past her 22d birthday) is warranted under these circumstances.

---

**6.** This section provides that "[h]ome instruction is an individualized special education program provided to a child with a handicap which pre-vents the child from attending a regular or special education program even with the aid of special transportation."

**624**

### III.

The district court's grant of summary judgment is reviewed *de novo*. *Pinney Dock and Transport Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1472 (6th Cir.1988). *See also Alexopulos v. Riles*, 784 F.2d 1408, 1410 (9th Cir.1986).

### IV.

■ When reviewing cases brought under the Act, courts must determine whether the state has complied with the Act's procedural requirements, and whether the IEP is reasonably calculated to enable the child to receive educational benefits. *Board of Educ. v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 3050, 73 L.Ed.2d 690 (1982). While the focus of the inquiry is clear, the appropriate standard of review is more elusive.

Section 1415(e)(2) of the Act provides that district courts "shall receive the records of the [state] administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." Although this section of the Act clearly provides for a "preponderance of the evidence" standard of proof, and although the Act envisions judicial review, by intermingling the standard of proof with the provision for judicial review the precise scope of judicial review has been obscured. Normally, a "preponderance of the evidence standard" would seem to imply a *de novo* standard of review.

In *Rowley*, however, the Supreme Court indicated that a complete *de novo* review is inappropriate. The "preponderance of the evidence" language in the statute

> is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.... The fact that § 1415(e) requires the reviewing court "receive the records of the [state] administrative proceedings" carries with it the implied requirement

that due weight shall be given to these proceedings.

*Id.*

Subsequently, this court determined that *Rowley*, "requires a *de novo* review [of the due process hearing] but that the district court should give due weight to the state administrative proceedings in reaching its decision." *Roncker ex rel. Roncker v. Walter*, 700 F.2d 1058, 1062 (6th Cir.), *cert. denied*, 464 U.S. 864, 104 S.Ct. 196, 78 L.Ed.2d 171 (1983). The court explained that "federal courts are 'generalists with no expertise in the educational needs of handicapped children,' and will benefit from the factfinding of a state agency with expertise in the field." *Doe v. Smith*, 879 F.2d 1340, 1343 (6th Cir.1989).

■ Where a state has set up a two-tiered review process, as has Ohio, the question that arises is which administrative decision deserves due deference: that of the IHO or the SLRO? We conclude that the only logical position, under *Rowley* and general principles of administrative law, is that federal courts are required to defer to the final decision of the state authorities, in this case that of the SLRO. As the Second Circuit recognized, it makes no difference that there may have been some disagreement among the state officers during the course of the state proceedings. *Karl v. Board of Educ. of Genesco School District*, 736 F.2d 873, 877 (2d Cir.1984).

In this case, it appears that the district court erred by failing to observe *Rowley's* teaching when it improperly substituted its own views for those of the final decision of the state authorities. Although the procedural posture of this case requires us to review the district court's decision *de novo*, we do so cognizant of the fact that we may not substitute our notion of sound educational policy for that of the school authorities and are required, instead, to give due weight to the decision of the SLRO.

#### A. *Procedural Compliance*

Plaintiff contends that two of the Act's procedural safeguards were violated. First, our attention is directed to the notice provisions of 20 U.S.C. §§ 1415(b)(1) and (2)

and 34 C.F.R. § 300.504(a)(12) which provide that parents of handicapped children must be given written notice before a public agency proposes to initiate or change the child's educational placement. Second, it is argued that defendant violated the Act's "stayput provision," which requires that the state maintain a child's "then current educational placement" pending resolution of any dispute.

■ Although the CBE concedes that it failed to comply with the written notice requirements of 20 U.S.C. § 1415(b)(1)(C), it argues, nevertheless, that actual notice was received, albeit orally and, therefore, any procedural violation was harmless. While recognizing that Congress has envisioned strict compliance with the Act's procedural safeguards because such compliance is the best way to assure that the Act's substantive provisions are enforced, we conclude that plaintiff's cause was not prejudiced. Mrs. Thomas received numerous telephone calls alerting her to the controversy arising from the panel's concern over Emily's ability to withstand school-based education. Similarly, since she requested additional time in which to review Emily's records it cannot be said that the second IEP conference took her by surprise. Finally, although she may not have received written notice that a new IEP conference would be held, she did participate in the conference which is, after all, the notice requirement's purpose.

Although we are not called upon to decide whether all violations of EAHCA's procedural requirements are to be assessed according to a separate test of prejudice, we are of the opinion that inquiry is proper here, since the only error was one of technical noncompliance which did not result in any substantive deprivation. Therefore, the violation cannot be said to amount to prejudicial error.

■ Mrs. Thomas also contends that the state violated the Act's stayput provision. Although neither side contends that the state was not required to maintain Emily's educational placement pending resolution of their dispute, they do disagree over what constitutes the "then current educational placement." Plaintiff argues that the term refers to the IEP in its original agreed upon form before its attempted revision. The CBE argues that since that IEP was never implemented, and the term is intended to preserve the status quo, the stayput arrangement is the education Emily was actually receiving, *i.e.*, one hour of home instruction per day.

Neither the Act itself nor its accompanying regulations define the term "placement." Its meaning is not difficult to discern where a dispute arises over a new IEP before it is implemented, but while a previous one is already in place. For example, where school officials unilaterally attempt to change a child's instruction, the child's "then current educational placement" will clearly be the previously implemented IEP. *See Honig v. Doe,* 484 U.S. 305, 108 S.Ct. 592, 98 L.Ed.2d 686 (school placement of child, prior to expulsion for handicap-linked behavioral problem, was the "current educational placement"). In this case, however, a dispute arose after the original agreed upon IEP was developed and officials sought its revision even before it was implemented. Since neither the original nor its revision had been implemented, no IEP was in effect. In such a situation, "placement" does not refer to an unimplemented IEP.

The Act defines certain terms, including "free appropriate education," 20 U.S.C. §§ 1401(18), and "individualized education program," 20 U.S.C. § 1401(19). In the section of the Act which sets out the various procedural safeguards, Congress specifically uses the term "free appropriate education" but does not refer to "individualized education program." Instead, the Act refers to the "then current educational placement" of the child. Had Congress intended a prospective IEP to govern the Act's stayput provision, as opposed to an operational placement, it could have employed the term "individualized educational program" which it had already defined. Since it did not, the term "then current educational placement" must be accorded, its plain meaning. Because the term connotes preservation of the status quo, it

refers to the operative placement actually functioning at the time the dispute first arises. If an IEP has been implemented, then that program's placement will be the one subject to the stayput provision. And where, as here, the dispute arises before any IEP has been implemented, the "current educational placement" will be the operative placement under which the child is actually receiving instruction at the time the dispute arises. In order to comply with the stayput provision, then, the school was required to continue providing Emily with five hours of home education per week until the dispute was resolved.

This conclusion is also supported by common sense. The essence of the controversy surrounding the IEP was whether Emily could safely sustain the rigors of school-based instruction. Since several of the professionals had serious reservations about Emily's safety, it would have been irresponsible to implement the IEP pending resolution of the dispute.

### B. *Substantive Compliance*

Although the Act requires states to provide a "free appropriate education" as a condition to receiving federal financial assistance, the Supreme Court has held that states are not required to provide an educational program to "maximize the potential of handicapped children." *Rowley*, 458 U.S. at 189, 102 S.Ct. at 3042; *Smith*, 879 F.2d at 1341. Rather, once it is determined that an IEP has been developed in accordance with the Act's procedural safeguards, the focus of inquiry becomes whether the IEP is "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207, 102 S.Ct. at 3051.

The question which was before the district court, and which we now consider *de novo*, is whether the Board's IEP, which provided for five hours of home instruction per week, is reasonably calculated to enable Emily to receive educational benefits. The district court concluded that the revised IEP was insufficient for two reasons: first, because Ohio law precludes home education unless a child is incapable of being transported to school; and second, because

"as a matter of law.... a school-based sensory motor program is the least restrictive and appropriate program for Emily and that the school must provide the above-described related services."

To support its conclusion, the district court, in essence, employed a syllogism which went as follows: Emily is entitled to a free appropriate education as a matter of law; the only free appropriate education under Ohio law, since Emily can safely be transported to school via ambulance, is school-based education; therefore, Emily must be transported to a school-based program as a matter of law. The syllogism, however, is based upon a faulty premise.

■ The two provisions of Ohio law upon which the district court relied do not reserve home education only for those children who cannot be transported to school. Ohio Rev.Code § 3323.12 provides that "[t]he board of education of a school district shall provide home instruction for handicapped children of compulsory school age who are unable to attend school, even with the help of special transportation." A definitional administrative regulation, Ohio Admin.Code § 3301–51–03(E)(1)(a), notes that " '[h]ome instruction' is an individualized special education program provided to a child with a handicap which prevents the child from attending a regular or special education program even with the aid of special transportation."

■ These provisions merely provide that if a child is unable to attend school, the Board must provide home education. They do not imply the converse, that home education may not be provided if a child is capable of being transported to school. Such an implication would thwart the clear purpose of the Ohio legislation, "to assure that all handicapped children ... shall be provided with an *appropriate* public education." Ohio Rev.Code § 3323.02 (emphasis added). Since the CBE was not foreclosed by Ohio law from developing an IEP which included home education, the issue is whether the IEP which provides one hour of home instruction per day is reasonably calculated to enable Emily to receive educational benefits. We conclude that it is.

The district court concluded that the school must send Emily to the SMI program because it is the least restrictive placement as a matter of law. Federal law, however, does not establish such placement preferences. Although federal law does establish a "mainstreaming" policy under which handicapped children are to be educated with nonhandicapped children to the maximum extent appropriate, reliance on this policy is misplaced here. There is no doubt that Emily cannot be educated in a regular classroom—her handicaps are simply too severe. Nor is it contested that Emily is unable to benefit from the social contact that a school setting provides. Accordingly, the mainstreaming concept is simply inapplicable.

Having concluded that the district court improperly rejected home education as a viable option, we must consider whether the SLRO was correct in her conclusion that home education was an appropriate placement for Emily. Again, we reiterate that although we review this conclusion *de novo*, we are not free to substitute our own notion of sound educational policy for those of the local school authorities.

The SLRO carefully reviewed the entire record and concluded that the school had established, through competent, credible evidence, that the IEP it developed for Emily was designed as a personalized program of instruction with support services sufficient to enable her to benefit educationally from that instruction. After reviewing the record, we must agree. Although it appears that Emily may receive fewer related services at home than at the SMI program, we are not deciding which placement will be more advantageous to Emily's development, only whether the revised IEP will enable her to benefit. All the experts agreed that Emily would benefit educationally from the revised IEP providing for additional home instruction and, indeed, plaintiff does not contend that this IEP is not appropriate, only that it is not as good as the SMI program. Under these circumstances, it is difficult to see how we could arrive at any other conclusion than that the school's revised IEP provides Emily with a free appropriate education. Since there is no dispute over whether the revised IEP will enable Emily to benefit educationally, we conclude that the school district has satisfied the Act's substantive provisions.

### V.

Since we have concluded that during the pendency of this dispute Emily has been receiving a free appropriate education, we must reject plaintiff's cross-appeal. Emily was never deprived of the free appropriate education to which she is statutorily entitled and, therefore, it is not necessary for us to decide whether the equitable remedy of compensatory educational services is available under the Act.

### VI.

For the foregoing reasons, the judgment of the district court is reversed and the case is remanded with instructions to enter an order of summary judgment in favor of defendant-appellant/cross-appellee.