MEMORANDUM
WISEMAN, District Judge.
The question before the court is whether the Rutherford County School District must, under the Individuals with Disabilities Education Act (“IDEA” or “the Act”), 20 U.S.C. § 1400-1461, provide nursing care for Samantha Neely while she attends school.[1] Following a hearing at which all parties were represented by counsel, an administrative law judge with the Tennessee Department of Education declared that such nursing care would not be services related to special education as defined under IDEA, and as such the school district is not required to pay for these services. IDEA provides that final orders of a state educational administrative body may be appealed to federal district court, which Ms. Neely’s parents have now done. See 20 U.S.C.A. § 1415(e) (West 1990 & Supp.1994). The standard of review is de novo, but the district court is not to substitute its judgment of a proper education for that of the state. See Dist. Bd. of Educ. v. Rowley, 458 U.S. 176, 205-07, 102 S.Ct. 3034, 3050-51, 73 L.Ed.2d 690 (1982). The district court is to review the evidence presented at the administrative hearing, as well as any other evidence the parties submit, and make any findings of fact necessary to its decision based on a preponderance of the evidence. See 20 U.S.C.A. § 1415(e)(2) (West 1990).
The full administrative record has been supplied to the court. The plaintiffs have supplemented this record by attaching the affidavit of Mr. George Neely to their brief in support of reversal. The defendant has filed an answer to plaintiffs’ complaint but has submitted no supplemental evidence. The plaintiffs moved for expedited review of the case, which the defendant did not oppose. A hearing was held April 4, 1994, at which the parties were given the opportunity to present arguments and additional proof, but no additional proof was offered. After considering the transcript of the administrative hearing and the exhibits thereto, the pleadings filed below, as well as the pleadings and affidavit filed here, the court makes the- following findings of fact based on a preponderance of the evidence and conclusions of law.
I
Samantha Neely is a seven-year old child who has Congenital Central Hypoventilation Syndrome, an extremely rare condition that causes trouble breathing. Persons afflicted by this disease often undergo a tracheostomy procedure to aid in their breathing. Samantha underwent such a procedure, in which an opening is made in the throat, known as a stoma, through which a breathing tube is *890 inserted. This tube must remain in place at all times, else Samantha’s breathing will stop or become shallow, she will lose consciousness, and she will die if full breathing is not quickly restored.[2] The breathing tube can become dislodged relatively easily (e.g., due to coughing or the adjustment of clothing).
As a result of the tracheostomy, Samantha cannot normally expel throat, mouth, and nose secretions. Accordingly, her breathing passages must be regularly suctioned by mechanical device to insure that the secretions do not create a blockage; such a blockage would lead to death if not quickly cleared. The number of times Samantha must be suctioned each day varies with the season and with Samantha’s health. For instance, when Samantha has a cold, she must be suctioned approximately every twenty minutes; when Samantha is in good health, she may need to be suctioned only after meals.
If Samantha’s breathing stops (e.g., because the breathing tube has become dislodged or blocked), she may require ventilation via an AMBU bag, which is a device that artificially pumps air into the lungs. If resuscitation and appropriate other care is not promptly administered—within a very few minutes—serious brain damage or death will occur.
Samantha is unable to provide her own tracheostomy care. A well-trained, poised individual is required to provide the necessary services. Insertion of the breathing tube can be difficult, the suctioning process must be carefully performed to avoid injury to Samantha, and there is little margin for error when resuscitation methods are required. In emergency situations, as can easily arise, the care provider must be sufficiently well-trained to avoid panic given the short response time necessary. Because of the life-threatening nature of Samantha’s condition, she requires constant monitoring. Samantha’s attendant must devote considerable amounts of his or her attention to Samantha and must never be very far away from Samantha. In a classroom setting, an attendant could conceivably provide services in addition to those provided to Samantha, but the attendant’s primary task would be the care of Samantha.
Last year, Samantha’s parents alternately attended school with Samantha to provide the care she needs. Due to the illness of another child, however, the Neelys were unable to provide these services again this school year. Accordingly, the Neelys petitioned the school district, and then the Tennessee Department of Education, to hire a full-time nurse or respiratory care professional to attend to Samantha during the school day. The school district initially agreed to make every effort to employ such an individual, revising Samantha’s individualized educational plan (the “IEP”) accordingly, but after some amount of searching,[3] the school district hired an individual with only a nursing assistant’s license to provide the care.[4] The school district was also prepared to train its teachers to aid in the care of Samantha. The Neelys objected to this care as inadequate to safeguard Samantha’s health and removed Samantha from school when the care requested was not promptly provided. After a meeting with school officials[5] to determine why an RN, LPN, or respiratory care professional had not been hired, the parents agreed to home instruction for Samantha until the Education Department had determined whether the school district must hire a full-time nurse to care for *891 Samantha. After the state administrative law judge ruled that the school district did not have to pay for such care, the Neelys filed suit in this court on December 30,1993. There is no contention that the state and school district failed to comply with the procedural requirements of IDEA; the only contention is that the school district has failed to comply substantively by not providing full-time nursing care.
II
Two preliminary questions must be answered to insure that the primary legal question—that of whether the school district is obligated to hire a nurse to care for Samantha—is properly before the court. First, is Samantha disabled as defined under IDEA? See 20 U.S.C.A. § 1401(a)(1)(A) (West Supp. 1994). There is no dispute that Samantha is disabled for purposes of the Act. See Thomas v. Cincinnati Bd. of Educ., 918 F.2d 618, 620 (6th Cir.1990) (noting that the Act adopted a “ ‘zero reject’ principle which brings within its protective ambit a wide range of handicapped children who require special education and related service”). The school district has classified Samantha as disabled and does not argue differently here.
Second, who may provide the care needed under state law? Must it be a licensed nurse or respiratory care specialist, as the parents contend? Under Tennessee law, only a licensed practical or registered nurse, a respiratory care specialist, certain relatives, or the patient him or herself, if possible, may perform the type of services needed by Samantha. See Tenn.’Code Ann. §§ 63-6-402, -410. A physician is not legally required to provide the care. Therefore, Samantha is covered by the Act, and if she is going to receive care at school from someone other than a parent, that person must be an appropriately licensed professional. This brings us to the primary legal question of whether IDEA requires the school to pay the salary of this professional.
A. Applicable Legal Standards
Section 1412 of IDEA dictates that states receiving federal education dollars must have in place “a policy that assures all children with disabilities the right to a free appropriate public education.” 20 U.S.C.A. § 1412(1) (West Supp.1994). “The term ‘free appropriate public education’ means special education and related services_” Id. § 1401(a)(18) (West 1990). “The term ‘special education’ means specially designed instruction, at no cost to parents or guardians, to meet the unique needs of a child with a disability, including instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and instruction in physical education.” Id. § 1401(a)(16) (West Supp.1994). Finally,
[t]he term “related services” means transportation, and such developmental, corrective, and other supportive services (including speech pathology and audiology, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, counseling services, including rehabilitation counseling, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children.
Id. § 1401(a)(17) (West Supp.1994).
The question here is whether the care requested by Samantha’s parents is a “related service” as defined above. If it is, then the school district must provide the service. If it is not, then the parents will have to provide the service or accept an alternative schooling arrangement. The answer to this larger question requires answers to two sub-questions: First, is the care Samantha needs a “supportive serviee[ ] ... required to assist a child with a disability to benefit from special education”? If so, does this care fall under the “medical services” exclusion within the supportive services definition?
The Supreme Court has provided guidance on both questions. In Irving Indep. Sch. Dist. v. Tatro, 468 U.S. 883, 104 S.Ct. 3371, 82 L.Ed.2d 664 (1984), the Court first considered whether catheterization services needed by a child suffering from spina bifida were “supportive services” within the purview of *892 the Act.[6] After noting that transportation services and access requirements are specifically required by the Act, the Court concluded that “[services like [this catheterization service] that permit a child to remain at school during the day are no less related to the effort to educate than are services that enable the child to reach, enter, or exit the school.” Id. at 891, 104 S.Ct. at 3876. Accordingly, the catheterization service was deemed a supportive service. Id.
The Court next considered whether this service fell within the “medical services” exclusion to supportive services. Relying on the federal Department of Education’s regulations providing more particularized definitions of the relevant terms, the Court concluded that excludable “medical services” are only those services that must be provided by a physician.[7] Id. at 892 & n. 10, 104 S.Ct. at 3377 & n. 10; see 34 C.F.R. § 300.16(b)(4) (1993) (defining “medical services”). Services provided by school nurses or other qualified personnel are “school health services” that must be provided as supportive services. Id. Because a physician did not have to provide the care required by the child in Tatro, the Supreme Court held that this, care was not an excludable “medical service.” The Court, however,
also supported its decision with a discussion of (1) the nature of the requested service and (2) the burden which it would place on the school district. With regard to the nature of the services, the Court explained that it was unable to distinguish between the services sought by the handicapped student and those routinely provided by the school nurse to nonhandicapped students. It pointed out that even a trained lay person could have provided the services requested. With regard to the burden, the Court began by recognizing that the genesis of the medical services exclusion was partly based on Congress’ intent to “spare schools from an obligation to provide a service that might well prove unduly expensive and beyond the range of their competence.” It noted that the “services provided by a physician or hospital,” which are excluded are “far more expensive” than the services of a school nurse.
Clovis Unified Sch. Dist. v. California Office of Admin. Hearings, 903 F.2d 635, 642 (9th Cir.1990) (citations omitted).
Largely because of the qualifications added by the Court, few lower courts have interpreted Tatro to institute a bright-line, physician-based definition of the medical services exclusion. See id. (rejecting the bright-line rule); Granite Sch. Dist. v. Shannon M., 787 F.Supp. 1020, 1026 (D.Utah 1992) (same); Bevin H. v. Wright, 666 F.Supp. 71, 75 (W.D.Pa.1987) (same); Detsel v. Board of Educ., 637 F.Supp. 1022, 1027 (N.D.N.Y.1986) (same), aff'd, 820 F.2d 587 (2d Cir.), cert. denied, 484 U.S. 981, 108 S.Ct. 495, 98 L.Ed.2d 494 (1987); see also Dep’t of Educ. v. Katherine D., 727 F.2d 809, 815 (9th Cir.1983) (pre-Tatro case using a burden-on-the-school-system test); Max M. v. Thompson, 592 F.Supp. 1437, 1444 (N.D.Ill.1984) (pre-Tatro case considering but rejecting the bright-line rule). But see Macomb County Intermediate Sch. Dist. v. Joshua S., 715 F.Supp. 824, 828 (E.D.Mich.1989) (adopting the bright-line rule). Instead, the courts have focused on the nature of the services requested, and on the concomitant costs to the school system, to determine whether these services fall within the medical services exclusion. The rationale for this approach is twofold. First, adoption of the bright-line rule would exclude certain services actually provided by a physician that could have been provided by an alternative caregiver. The fact that a doctor happens to provide certain services should not, in and of itself, insulate a *893 school from paying for the services. See Clovis, 903 F.2d at 643; Max M., 592 F.Supp. at 1444. Second, endorsement of the bright-line rule could force schools to incur considerable medical costs for one child to the great detriment of the district and its other children. See Shannon M., 787 F.Supp. at 1026 (“The court does not read Tatro to stand for the proposition that all health services performed by someone other than a licensed physician are related services under the Act regardless of the amount of care, expense, or burden on the school system and, ultimately, on other school children”).
The reasons for rejecting the bright-line rule are persuasive. The reason for utilizing the bright-line rule, on the other hand, is unconvincing. Nondiagnostie medical services are excluded from the Aet because they tend to “be unduly expensive and beyond the range of [the schools’] competence” to provide, Tatro, 468 U.S. at 892, 104 S.Ct. at 3377; the physician-based test is presented as a good way for judging the cost and burden of providing certain services (i.e., as a good surrogate test). Yet, as noted above, this will not always be the case. A much better test is the direct test. By examining directly the burden imposed on a school, one avoids the perverse effects of excluding inexpensive medical services that happen to be provided by a physician and including enormously expensive services that are clearly medical in nature.
Additionally, it is not apparent that Congress or the Supreme Court meant for the title of the caregiver to be the sole determining factor in medical exclusion cases. There is no direct guidance from Congress within the Act as to what services fall within the medical services exclusion. Accordingly, the Department of Education supplied a definition. Although the Supreme Court accepted the agency’s physician-based definition of the exclusion as a reasonable one in the Tatro case, the Court made a point of indicating how tiow-burdensome the care required there would be and of limiting its holding to assuage school district’s fears of costs run rampant. See Tatro, 468 U.S. at 894-95, 104 S.Ct. at 3378; see also Clovis, 903 F.2d at 644 (“[T]he Court held only that services which' must be provided by a licensed physician, other than those which are diagnostic or evaluative, are excluded and that school nursing services of a simple nature are not excluded.”).
B. Application to the Present Facts
Most of the discussion above centered around the medical services exclusion. The initial question, however, is whether the nursing care requested is a supportive service within the purview of the Aet. Under the IEP at issue, which involves Samantha’s daily attendance at school, there can be no question that the services requested by the plaintiffs are “supportive services required to assist a disabled child to benefit from special education.” Absent the nursing care, Samantha could not attend school and thus would not receive the special education designed for her benefit in her IEP. When one considers an alternative IEP that involves home instruction, then of course this conclusion no longer follows. But under the IEP as agreed to by the parents and school, full-time nursing care is a service required to allow Samantha to achieve educational benefits.
The question arises whether a supportive service may be deemed “required” if under one IEP it is essential but under another, reasonable IEP it is not. Because a court is “not free to substitute [its] notion of sound educational policy for those of the local school,” Thomas v. Cincinnati Bd. of Educ., 918 F.2d 618, 627 (6th Cir.1990); see Board of Educ. v. Rowley, 458 U.S. 176, 204-10, 102 S.Ct. 3034, 3049-53, 73 L.Ed.2d 690 (1982), a court may only consider those IEPs formulated by the parties and presented to the court. Therefore, for purposes of determining whether a service is a supportive service, a court may only consider that service in the context of a properly submitted IEP.
Having found the requested service to be a “supportive service” within the purview of the Act, the court must next decide whether this service falls within the medical services exclusion. This question would be *894 easily answered (in the negative[8]) if the court were to employ the physician-based test of the exclusion, for the most obvious benefit of this test is its ease of application. However, this court will examine the nature and costs of the requested service to decide whether it is excluded, and this test is some: what more difficult to apply.
The requested care must be provided by a licensed nurse or respiratory care specialist. It is full-time in nature, requiring that the nurse or attendant devote his or her constant attention to Samantha. Although Samantha’s father avers, in his supplemental affida"vit, that it was not the plaintiffs’ intention to request exclusive care for Samantha, the evidence presented at the hearing preponderates against any conclusion otherwise. While it is true that a nurse might be able to attend briefly to others in Samantha’s room, there is no dispute that Samantha requires constant attention and often one-to-one care. The plaintiffs repeatedly point out in their briefs that Samantha’s life-threatening condition requires that Samantha be the attendant’s number one priority, and there is no evidence to the contrary.
As to the cost of this care, the evidence indicated that a properly qualified individual could be retained at an hourly rate of $9. This rate is approximately two dollars higher than the rate at which the nursing assistant originally hired by the school was to be employed. The school district currently employs at least two other certified nurse’s assistants who are paid between $6.75 and $7 per hour. If we assume a forty hour work week for 9.5 months, the $7 per hour rate translates into base salary of $10,640 and the $9 per hour rate translates into a base salary of $13,680. Cf. Shannon M., 787 F.Supp. at 1029 (excluded tracheostomy care estimated to cost $30,000 annually).
Although the care requested is clearly medical in nature, the costs of this care would not be so burdensome that the service should fall within the medical exclusion. The school district currently employs personnel who perform tasks similar to that Samantha’s nurse would perform; the costs of that care and of .the requested care are comparable.[9] Moreover, an alternative schooling arrangement, presumably home schooling, would not be cost-free to the school district. Most importantly, the requested service will allow Samantha to benefit from a plan of special education that all parties agree she seriously needs, in a mainstream environment. See Thomas, 918 F.2d at 627 (federal law established a preference for “mainstreaming” of disabled children). The gains to the child, relative to-the burden imposed on the school district, are weightier. Absent evidence that the care requested would be unduly burdensome to the school district, the nursing care will be deemed a related, supportive service that falls outside the medical services exclusion.
Ill
For the reasons stated above, the defendant will be directed to provide the care requested by the plaintiffs in an accompanying Order.
ORDER
For the reasons stated in the Memorandum filed herewith, the services requested by the plaintiffs are supportive services that do not fall within the medical services exclusion. Accordingly, Rutherford County Schools are obligated and hereby ORDERED to provide the requested care.
It is SO ORDERED.

. IDEA was previously titled the Education of the Handicapped Act.

. When Samantha is sleeping, she must be attached to a mechanical ventilator because she cannot breathe on her own at all when unconscious.

. The Neelys characterize the school district's efforts as insufficient; the school district characterizes these efforts as sufficient. The proper characterization is immaterial to the question before the court.

. This nurse's assistant was to be paid between $6.75 and $7 an hour. The school district currently employs at least two other persons at this rate who perform similar duties (i.e., care for medically fragile children). A licensed practical nurse, who was then employed by a home health care service at an hourly rate of $9.09, attempted to apply for the position but was told a nurse would likely not be hired for the position.

.This meeting involved the parents and members of the multi-disciplinary team, or M-team, assigned to Samantha's case.

. Although the Court considered the act several years ago, when it was still the Education of the Handicapped Act, none of the relevant provisions have changed substantively.

. The relevant regulation defines only those medical services that must be paid by a state: " 'Medical services' means services provided by a licensed physician to determine a child's medically related disability that results in the child's need for special education and related services.” 34 C.F.R. § 300.16(b)(4) (1993). It does not explicitly define excludable medical services, but the logical definition was drawn by the Supreme Court: "Presumably this means that 'medical services’ not owed under the statute are those 'services by a licensed physician' that serve other purposes.” Tatro, 468 U.S. at 892 n. 10, 104 S.Ct. at 3377 n. 10.

. The services need not be provided by a physician, nor have they been requested to be, and so they would not fall under the medical services exclusion under the bright-line test.

. Although the care requested is very similar to that excluded by the courts in Detsel, 637 F.Supp. at 1026-27 (constant, in-school nursing care for a child with a tracheostomy), and Bevin H. 666 F.Supp. at 73, 75 (constant care for a multiply-handicapped child who has a tracheos-tomy), it is hard to justify labelling the care requested here as “too burdensome” when the school district already provides similar, though somewhat less costly, care to other children in the district.