Allen MORGAN, Superintendent of Knox County Schools, Plaintiff,

v.

CHRIS L., a minor, by next friend MIKE L., Defendant.

No. 3:93–cv–524.

United States District Court,
E.D. Tennessee,
Northern Division.

Sept. 29, 1994.

John E. Dowling, Jr. and John E. Owings, Office of Knox County Law Director, Knoxville and Charles L. Weatherly, Atlanta, GA, for Plaintiff.

Dean H. Rivkin, University of Tennessee Legal Clinic, Knoxville and Brenda McGee, Knoxville, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JORDAN, District Judge.

This is a civil action for review of the decision of an administrative law judge (ALJ) under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400, *et seq.* (IDEA).

This court's jurisdiction of this civil action is established by 20 U.S.C. § 1415(e)(2) and (4)(A). In accordance with the mandate of the second sentence of § 1415(e)(2), this court has considered the records of the administrative proceedings compiled in this case, and has heard oral testimony and the arguments of counsel. The court has drawn its findings and conclusions stated herein from a preponderance of the evidence taken as a whole.

There is no dispute in this case that the parties have exhausted the administrative remedies available to them. The Honorable Jack E. Seaman, the ALJ appointed by the Tennessee Department of Education, issued a final order on July 28, 1993. [R. at 10–31.][1]

■ It is difficult to say what degree of deference this court should accord to the ALJ's findings and conclusions in this case. The appellate courts have been unable to divine clear guidance from the statutory language. *See, e.g., Thomas v. Cincinnati Board of Education,* 918 F.2d 618 (6th Cir. 1990). It seems clear that the central issue in this case, whether the defendant child was entitled to have the filing of a juvenile court petition seeking adjudication of him as a delinquent or unruly child treated as a change in placement, should be considered *de novo* ; this is an issue of law concerning the level of procedural protection which IDEA requires for a child in the circumstances shown in this case. The ALJ's findings of

fact, on the other hand, are entitled to deference, inasmuch as he heard the testimony presented here by way of a transcript, and given that he is employed by a state agency with expertise in this field. *See id.* at 624. Whatever the appropriate scope of review, the court finds all of the ALJ's findings of fact fully supported by the record.

These findings of fact reveal the following chronology. The defendant child, Chris L., was diagnosed as suffering from attention deficit hyperactive disorder (ADHD) in May 1992. This diagnosis by a private practitioner came after a school psychologist had suggested that the child suffers from this disorder. In May 1992, near the end of the academic year, the child's father delivered to the child's school Chris L.'s medicine prescribed to control his ADHD. There is no dispute that the school had knowledge of the facts that Chris L. had been diagnosed as suffering from this disorder, and that he was being treated with prescription medication for it.

When the 1992–1993 academic year commenced, no M-team was convened to consider this child's case; the process to consider this child as a candidate for special education was not initiated until February 1993. (At least once in an earlier academic year, it had been decided that the child was not disabled for IDEA purposes.) Throughout the 1992–1993 year, his academic performance and behavioral problems continued, and worsened. There was frequent contact between school personnel and Chris L.'s father, concerning such subjects as monitoring the child's behavior for the purpose of advising his pediatrician of the effects of changes in the dosage of his medication, and whether the child might benefit from psychotherapy. As the ALJ found, "The student began receiving psychological services after his first meeting with the psychologist in March of 1993 and the school personnel knew that the student was seeing the psychologist." [R. at 15.]

---

1. References to "R." and page numbers are to the administrative record filed in this civil action. Judge Seaman certified this record on December 9, 1993, and the Tennessee Attorney General sent it to the clerk of this court under the cover of a letter dated December 17, 1993. The notice of the filing of this administrative record appears as doc. 19 in this court's record of this civil action.

The father, Mike L., returned to school with his son on May 17, 1993, after having received oral notice that there would be a disciplinary hearing concerning his son held on that date. This turned out to be what the ALJ aptly called a "makeshift" M-team meeting. [R. at 28.] At this meeting, the child was certified as disabled for the purposes of IDEA. The individuals present then discussed a May 11, 1993, incident of vandalism at the school, and the child's principal stated that while the child's destructive behavior was related to his ADHD, the fact that he had been in a lavatory which he was not authorized to visit when he committed the act of vandalism was not. The principal then stated that the child's unauthorized presence in the lavatory would result in discipline.

The ALJ's summary of the child's father's testimony at the due process hearing before the ALJ concerning what happened next merits quotation:

> Throughout this meeting on May 17, 1993 the father was not advised of any rights under the IDEA. He was informed that he would later hear from the juvenile officer once they decided if they were going to file any charges or not. He called the juvenile officer later that same day and was informed that a petition had been filed. He later received in the mail a copy of the juvenile petition which had been sworn to *on May 12, 1993.*

[R. at 17 (emphasis added).]

It should be noted that the plaintiff superintendent did not call any live witnesses at the due process hearing before the ALJ. In addition to his father, Mike L., Chris L. called his psychologist, Lance T. Laurence, Ph.D. Dr. Laurence testified, to use the ALJ's words, "that the student's recorded behavior was consistent with behavior of a child with ADHD," and that the act of vandalism committed on May 11, 1993 (assuming that Chris L. committed it), "was a manifestation of the student's disability." [R. at 18.]

There is no dispute in this case that an M-team was assembled for the purpose of assessing this child in February 1993, and that Chris L. was therefore a subject of assessment for IDEA purposes when the May 11, 1993, act of vandalism occurred. It is also undisputed that before May 17, 1993, when Chris L.'s father participated in the M-team meeting, of which he had inadequate notice, to quote the ALJ again, "the student did not have an IEP [2] or placement."

The ALJ's conclusions merit quotation in part:

> The filing of a petition in Juvenile Court shall be considered as the initiation of a change in placement and/or a disciplinary action commensurate with expulsion or suspension for more than ten days.

> At least beginning with the date a child is referred for an evaluation, before a school files a petition against a child in Juvenile Court, it must follow the same procedures as for expulsion or suspension for more than ten days. The M–Team must determine if the behavior was a manifestation of the child's physical or mental characteristics and the appropriateness of the placement.

> \*　\*　\*　\*　\*　\*

> The school may suspend the student for up to ten days, they (sic) may reach some agreement with the student's parents regarding a change in placement, or the school may apply to a court for specific relief if a dangerous situation is presented.

[R. at 29–30 (citations omitted).] On the basis of these conclusions, the ALJ ordered the plaintiff to "take all actions necessary to seek dismissal of the juvenile court petition filed against this student." [R. at 30.]

In so concluding and ordering, the ALJ was on firm precedential ground. As counsel for Chris L. pointed out to the ALJ, at least one other Tennessee Department of Education ALJ has ruled in a due process hearing arising out of a case involving a different student and a different school system, "It was a violation of the special education law for the School System to initiate a

---

**2.** "IEP" stands for "individualized education program", which IDEA requires local educational agencies to establish or revise for each child with a disability. 20 U.S.C. § 1414(a)(5). "Individualized education program" is defined in the act in 20 U.S.C. § 1401(a)(20).

juvenile petition against the child without first calling an M–Team meeting to determine how to deal with the boy's behavior." *In re: Male Special Education Student Age 14,* Tennessee Board of Education, Oct. 9, 1987, memorandum decision at 12. [R. at 268.] The ALJ in *In re: Male Special Education Student* similarly ordered the school system in that case to "do everything it can to have that petition [filed in juvenile court], which is presently on appeal, dismissed." *Id.* at 17. [R. at 273.]

In *In re McCann,* 1990 WL 16883, 1990 Tenn.App. LEXIS 125 (Tenn.Ct.App.), *perm. app. denied* (Tenn.1990) (*per* Anderson, now Justice), the case arose in a different manner procedurally, but the issues were very similar to those in the case at bar. The Tennessee Court of Appeals in *McCann* was reviewing a circuit court's affirmance of a juvenile court's adjudication of a disabled child as unruly. The appellate court noted that before the juvenile court had considered the unruly petition filed by a school system employee, administrators at the child's school had scheduled and then cancelled an M-team meeting, and had sent to the child's parents a letter notifying them that the child needed therapeutic care/counseling, and notifying them that the school system had scheduled an appointment with the juvenile court judge to discuss the child's placement.

In overturning the adjudication of unruliness, the court of appeals in *McCann* stated that this notice clearly failed to comply with the Tennessee regulations which govern the notice required whenever a change in a disabled child's placement is considered. The court also held that the filing of the unruly petition and the hearing on the petition which resulted in the child not attending school for two months constituted a change in educational placement. Noting that IDEA (then the Education of the Handicapped Act, or EHA) gave school administrators a choice in dealing with a dangerous disabled child between suspension for up to 10 days and applying to a court for relief, the court of appeals concluded,

> When a juvenile judge is evaluating an alleged unruly child, and it is possible that the child needs special education, then the

Tennessee regulations and EHA provisions cited previously will govern the evaluation of that child. It is obvious that if the child is already in special education when referred to the juvenile judge that (sic) the special education regulations will govern the evaluation. This includes the convening of the M–Team and the threshold determination of whether the child's unruly conduct is a manifestation of his handicap. The juvenile Judge and circuit judge failed to follow this statutory mandate in their review of [McCann's] case.

*In re McCann, supra,* 1990 WL 16883 at *4, 1990 Tenn.App. LEXIS 125 at *12. The court of appeals therefore reversed the circuit court's affirmance of the adjudication of unruliness.

■ The plaintiff superintendent's attempts to distinguish *McCann* here fail, this court concludes. In the case at bar, the school administration, after failing to comply with IDEA's procedural requirements with respect to a timely determination of Chris L.'s eligibility to be treated as a disabled child under the act and with respect to the content and timing of notice to the child's parents, decided on May 17, 1993, that the child should be certified as educationally disabled because of ADHD. In spite of this decision, the administration proceeded to file its unruly petition in the juvenile court, without treating the commencement of the juvenile court proceeding as a change in educational placement entitling the child to the procedural and substantive protections mandated by the act whenever a change in educational placement is proposed. This was a deprivation of this child's statutory rights, and the ALJ properly fashioned his relief in the form of an order requiring the plaintiff superintendent to seek termination of the juvenile court proceeding.

Contrary to the plaintiff's argument, this case does not involve overreaching by the ALJ past the limits of his jurisdiction to interfere with the juvenile court's exercise of its jurisdiction. For one thing, the ALJ did not order the juvenile court to do anything; instead, it ordered the plaintiff, a litigant in the proceeding before the ALJ, to seek dismissal of the proceeding on the unruly peti-

tion. The ruling and order of the ALJ in this case did not, as the plaintiff appears to argue, create a conflict or any tension between federal law as expressed in IDEA and the Tennessee law of juvenile justice, for Tennessee statutory law commands each juvenile court to follow state and federal laws governing evaluation whenever the court determines that the child before it is in need of special education services. Tennessee Code Annotated § 37–1–128(c)(1).

The plaintiff superintendent argues that *McCann* might be distinguished from the case at bar because Chris L. was not removed from school for a period in excess of 10 days. What makes the filing of an unruly petition a change in placement for IDEA's purposes, however, is the potential which juvenile court proceedings have for changing a child's educational placement in a significant manner. The plaintiff's argument on this point is an after-the-fact one, akin to arguing that a light sentence in a criminal case excuses a deprivation of due process in the course of the proceeding.

Contrary to the plaintiff's argument, upholding the ALJ in this case does not render the Tennessee Department of Education a super-legislature which decides the jurisdiction of Tennessee's juvenile courts on an *ad hoc* basis, nor does it provide each child who qualifies as disabled under IDEA with immunity from punishment in Tennessee's juvenile justice system. All that the administrative order entered in this case requires is that initiation of juvenile court proceedings concerning a disabled child be treated as a change in educational placement, so that the child receives all of the protections mandated by IDEA before adjudication of the child as unruly or delinquent commences. The plaintiff's argument that the school administration in this case determined that Chris L.'s unauthorized presence in the lavatory where the vandalism occurred was not related to or caused by his condition of ADHD, and that it was therefore appropriate to commence the challenged juvenile court proceeding, skips over the fact that this determination was made at the "makeshift" M-team meeting concerning which the child's parents had plainly inadequate notice.

At the hearing before this court, the plaintiff made what the defendants' attorneys aptly characterized as a "parade of horrors" argument, designed to show that compliance with IDEA might force a school system to keep in a school, at least for a limited amount of time, a child shown to be dangerous. Whatever the weight which this argument might carry in the abstract, there is nothing in the record before this court to show that the child in this case presented a risk of physical injury to anyone. There was no emergency in this case on the basis of which the plaintiff superintendent might have been excused from compliance with IDEA or with the ALJ's order.

The only issue presented by the plaintiff's appeal in this case, the court concludes, is whether the ALJ properly ordered the plaintiff to seek termination of the juvenile court proceeding against Chris L. For the reasons stated above, the court holds against the plaintiff superintendent on this issue, and respectfully declines to follow the authorities from foreign jurisdictions cited by the plaintiff. Some of the issues stated in the plaintiff's brief [doc. 24], such as whether the incident of vandalism in issue was a manifestation of ADHD in this child's case, and whether it would not be better for the child in this case, from a therapeutic point of view, to face in the juvenile court the ordinary legal consequences of his alleged actions, seem to the court to be invitations to substitute its judgment and discretion for those of the ALJ, in spite of the deferential standard of review required in cases of this nature with respect to findings of fact. The court declines to enter into consideration of these issues of educational policy and the child's best interests, for which it, unlike the ALJ appointed by the Tennessee Department of Education, is poorly qualified.

A final argument made by the plaintiff superintendent which the court feels compelled to address is that the diagnosis of ADHD in this case was a misdiagnosis, and that Chris L. suffered at all relevant times instead from an oppositional defiant disorder which did not qualify him to be treated as disabled for IDEA's purposes. Setting aside the issues whether the plaintiff should be

272

permitted to rely on medical evidence developed after the hearing before the ALJ, and whether this court is the proper forum to consider the correctness of the diagnosis of ADHD in this case, the court finds that the plaintiff has misconstrued the evidence on which he relies. John B. Robertson, Jr., M.D., a specialist in child and adolescent psychiatry, diagnosed oppositional defiant disorder, but he has made it clear in an affidavit attached to a brief filed by the defendants [doc. 29, ex. H] that he defers to the diagnosis of ADHD made earlier by Dr. Laurence, the psychologist. Dr. Robertson testified in his deposition given in this case on January 26, 1994, that the child was being treated with medication for ADHD when he saw the child, which might explain why he did not note symptoms of ADHD. Furthermore, as Dr. Robertson explained in this deposition, diagnoses of ADHD and of oppositional defiant disorder are not necessarily conflicting, because the former can lead to the latter, which can in turn be manifested by the afflicted child telling lies.

■ The defendants counterclaimed in this case for an award of attorneys' fees under 20 U.S.C. § 1415(e)(4)(B), which provides that in an action or proceeding brought to enforce rights under IDEA, "the court, in its discretion, may award reasonable attorneys' fees as part of the costs to the parents or guardian of a child or youth with a disability who is the prevailing party." The plaintiff superintendent argues that because the defendants demanded a due process hearing so soon after requesting that Chris L. be treated as a disabled student under IDEA that the plaintiff did not have an opportunity to gather information and respond to the request, the defendants' attorneys created a situation in which their clients could not fail to be prevailing parties, entitling the attorneys to be paid by their clients' adversary. For this reason, the plaintiff says that the court should find that the parties could have resolved many of the issues between them without this litigation, and so should deny the counterclaim in whole or in part.

Having considered the record and the applicable law, *see Phelan v. Bell,* 8 F.3d 369 (6th Cir.1993); and *Krichinsky v. Knox County Schools,* 963 F.2d 847 (6th Cir.1992), the court concludes that the defendants are prevailing parties who are entitled to an award of 100% of their attorneys' reasonable fees. The court finds that absent these attorneys' work and their demand for a due process hearing before the ALJ, the Knox County School System would have given only minimal consideration to Chris L.'s status as a disabled student, and would have proceeded to seek an adjudication of him in the juvenile court without considering the impact of the adjudication on his educational placement. While the parties resolved five out of six issues by agreement once the case was before the ALJ, this does not mean that the defendants were not the prevailing parties for the purpose of the statute; the defendants successfully altered the legal relationship between themselves and the Knox County School System.

To the extent that the parties resolved issues by agreement, the defendants' attorneys did not have to expend time litigating these issues, and so the plaintiff will not be penalized for having agreed to settle the issues. There is no evidence before the court concerning the amount claimed by the defendants' attorneys, and so the court will enter judgment on the counterclaim against the plaintiff in an unspecified amount, and will require the defendants to file a postjudgment motion for an award of their attorneys' fees.[3] In considering this motion and the material filed in support of and in opposition to it, the court will be able to assess the reasonableness of these attorneys' claimed rates and their hours expended in working on this case.

The court will enter a judgment order in accordance with these findings of fact and conclusions of law.

**3.** "Motions for attorney's (sic) fees are collateral to the merits of an action and may be considered

even after an action is terminated." *Phelan v. Bell, supra,* 8 F.3d at 372 n. 4 (citations omitted).