Tiffiney JOHNSON, Petitioner,

v.

METRO DAVIDSON COUNTY SCHOOL SYSTEM, Respondent.

No. Civ.A. 3:98-0121.

United States District Court, M.D. Tennessee, Nashville Division.

Aug. 10, 2000.

Alex Jay Hurder, Vanderbilt Legal Clinic, Vanderbilt School of Law, Nashville, TN, for Georgianna Johnson, plaintiff.

Kennetha Sawyers, Metropolitan Legal Department, Nashville, TN, John Lee Kennedy, Metropolitan Legal Department, Nashville, TN, for Metropolitan Nashville and Davidson County School System, defendant.

### Memorandum Opinion

WISEMAN, Senior District Judge.

This is a claim filed pursuant to the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1401, *et seq.* Before the Court is Petitioner's Motion for Judgment on Appeal and Request for Court to Receive Additional Evidence. (*See* Docket Entry, hereinafter "DE," 19.)

## BACKGROUND

*Procedural History*

On 11 November 1996, Tiffiney Johnson ("Petitioner") by and through her parents, Georgianna and Lester Johnson requested a due process hearing. (Technical Record of the Administrative Record ("R") at 2, 189.) Specifically, Petitioner sought both certification as disabled within the meaning of the IDEA and the resulting benefits from Metropolitan Nashville and Davidson County School System ("Respondent"). (R. at 189.) A due process hearing was held on the 16th and 17th of July 1997 at the school board offices in Nashville, Tennessee. (R. at 189.) On 9 December 1997, an administrative law judge ("ALJ") found that "the student is not eligible for special education and related services under the basis of Health Impairment, Serious Emotional Disturbance, or Learning Disabilities." (R. at 206.)

Petitioner appealed the ALJ's decision on 9 February 1998. (*See* Compl., DE 1, at 1.) Finding jurisdiction under the IDEA, 20 U.S.C. § 1415(i)(2)(A), and 28 U.S.C. § 1331, Petitioner seeks review and reversal of the ALJ's decision a determination that Petitioner is eligible for special education and related services under the IDEA: reimbursement from Respondent for her expenses incurred to provide her a private education from December 1995 to January 1998; reimbursement for the costs of an independent educational evaluation by Judith Kaas Weiss, Ph.D.; and any other appropriate legal or equitable remedy. (*See* Compl. at 3.)

*Review of the Record*

Tiffiney Johnson was born 22 October 1981 and was adopted by Georgianna and Lester Johnson when she was four months of age. (Transcript ("Tr.") at Pl.'s Ex 13 p. 1.) Tiffiney's schooling began with kindergarten at Goodpasture Christian School. (Tr. at 218.) Her parents chose Goodpasture because they knew Tiffiney was hyperactive and thought she would benefit from attending school with children she

already knew. (Tr. at 260–61.) Ms. Johnson did not investigate what public school Tiffiney would have attended. (Tr. at 261.)

Tiffiney's first grade teacher at Goodpasture recommended she undergo psychological testing. (Tr. at 219.) In concert with Tiffiney's pediatrician, the Johnsons took Tiffiney to The Learning Lab, Inc., for a psychological evaluation on 30 May 1989. (Tr. at Ex 2. p. ___.) Gillian Blair, Ph.D., performed the evaluation. (*See id.*) In the background section of Dr. Blair's report, she notes that Tiffiney has always been very active and that Tiffiney is caught between the strong religious beliefs of each of her parents. (*See id.*) Dr. Blair also noted that Mr. Johnson feared that he and Mrs. Johnson had contributed to Tiffiney's problems by spoiling her and being too lax in terms of discipline. (*See id.*) Dr. Blair noted that Tiffiney's test scores were "unusual, and [ ] indicative of a learning disability with an emotional overlay." (*Id.*) Dr. Blair additionally noted that Tiffiney demonstrated considerable physiological correlates of anxiety and that her responses to certain tests were "suggestive of high expectations of perfect behavior." (*Id.*) In her recommendations, Dr. Blair suggested Tiffiney "should be considered for certification as a child with specific learning disabilities in both reading and mathematics"; that Tiffiney would benefit from both family and individual counseling; and that she should be evaluated "to determine whether she would benefit from a trial of medication to help her attention deficit disorder." (*Id.*)

On 15 December 1993, Michael G. Tramontana, Ph.D., performed a psychological/neuropsychological evaluation of Tiffiney, (Tr. at 228; Pl.'s Ex. 13.) Dr. Tramontana's evaluation suggested "possible frontal lobe dysfunction," but acknowledged that "this impression should be regarded as speculative in the absence of corroborating neurological evidence." (Pl.'s Ex. 13 at 5.) Additionally, he noted that "the findings are not entirely consistent with ADHD." (*See id.*)

Rather, Dr. Tramontana concluded that a "more appropriate diagnostic alternative may be an Impulse Control Disorder NOS." (*Id.*) Tiffiney's intelligence testing results from this evaluation were significantly lower than those taken in 1989. (*See id.*) This decrease suggested "that Tiffiney's lack of focus and disinhibition have interfered with her keeping optimal pace in her cognitive development." (*Id.*) Dr. Tramontana recommended a "fair amount of structure and supervision in promoting on-task performance" for Tiffiney in school. (*Id.*) Although she seemed atypical for ADHD, "the type of programming that she will require in school will most closely resemble the needs of an ADHD child." (*Id.*)

Tiffiney remained at Goodpasture until 23 October 1995 when she was expelled from the eighth grade. (Tr. at 220, 226, 234.) After her expulsion from Goodpasture, the Johnsons did not explore whether or not Metro Davidson County School System could offer Tiffiney the services she required at school due to her learning, behavioral, and emotional problems. (Tr. at 267, 289.) Mrs. Johnson explained this decision by noting that she and her husband "did not want to be a burden on Metro if we could provide the proper help." (Tr. 267.) The Johnsons enrolled Tiffiney at Benton Hall School. (Tr. at 229.) Ms. Johnson wanted to try Benton Hall because "they said they could work with oppositional youngsters and behavior problems." (Tr. at 229.)

On 7 December 1995, Ms. Johnson asked for special education assistance from Metro Public Schools. (Tr. at 235.) On 23 January 1996, Ms. Johnson asked Metro to perform an educational evaluation of Tiffiney. (*See* Pl.'s Ex. 1–E.) On 2 February 1996, Ms. Johnson requested an M–Team meeting within ten days. (*See id.*) On 19 February 1996, Metro notified the Johnsons that an M–Team meeting has been scheduled for 1 March 1996. (*See id.*)

Attending the 1 March 1996 M–Team meeting were Mr. and Mrs. Johnson, Chris Seibert, a special education teacher, and Dr. Warren Thompson, the Metro school psychologist. (*See* Pl.'s Ex. 1–E.) The Johnsons were informed of their rights under the special education law. Dr. Thompson reviewed Dr. Tramontana's report and suggested that Tiffiney might be Seriously Emotionally Disturbed ("SED"), but Ms. Johnson suggested that ADHD was a more appropriate diagnosis. (Pl.'s Ex. 1–E.) The Johnsons discussed Tiffiney's history and her strengths and weaknesses. (*See id.*) They noted that Tiffiney had been having severe problems at school and that they had sought help from Johanna Shadoin, a counselor, and Elizabeth Hoover, a psychiatrist. (*See id.*) They agreed that a language assessment should be performed and to re-convene on 26 March 1996. (*See id.*)

Present at the 26 March 1996 meeting were Mr. and Mrs. Johnson, Chris Seibert, Crystal Lumm, and Warren Thompson. Ms. Lumm, the speech-language pathologist for Metro Schools, reported on her evaluation of Tiffiney. (Pl.'s Ex. 1–E; Pl.'s Ex. 14.) The evaluation indicated that Tiffiney had basically average to low-average language skills. (Pl.'s Ex. 1–E.) Dr. Thompson suggested that either SED or Health Impaired ADD certificates should be considered. (Pl.'s Ex. 1–E.) Because the diagnostic picture was unclear, however, they agreed to contract Dr. Hoover, a psychiatrist, for clarification of the certification issues. (*See* Pl.'s Ex. 1–E.)

The M–Team met again on 9 April 1996 with Chris Seibert, Warren Thompson, and Mr. and Mrs. Johnson in attendance. (Pl.'s Ex. 1–E.) The notes from the meeting do not indicate that much happened. They agreed to meet again on 17 April 1996. This meeting was canceled because a failure to obtain a doctor's diagnosis of disability. (*See* Pl.'s Ex. 1–E.)

During this time in which the M–Team was periodically convening, Dr. Hoover evaluated Tiffiney's condition. (Pl.'s Ex. 15.) Based on her initial psychiatric evaluation, she diagnosed Tiffiney with Oppositional Defiant Disorder and a Parent/Child problem. (*See id.*) Dr. Hoover did not feel that medication therapy was warranted nor did she feel that the available data supported certification as Seriously Emotionally Disturbed. (*See id.*)

Also during this time period, Dr. Thompson evaluated Tiffiney on 7 February 1996 and 20, 22, and 30 May 1996. (*See* Pl.'s Ex. 12.) At one point, he was summoned to Benton Hall School to inspect marks which Tiffiney had made on her arm. (Pl.'s Ex. 12 at 2.) Thompson noted, "The marks consisted of superficial 'criss-cross' marks which Tiffiney said she had made with a piece of plastic. She stated that her boyfriend had made similar marks on his arm." (*Id.*) Dr. Thompson found that Tiffiney was functioning within the average range of intellectual abilities and that there was no evidence of learning disabilities. (Pl.'s Ex. 12 at 4.) He concluded that Tiffiney was impulsive, manipulative, and inclined to be oppositional to authority figures. (*See id.*) Dr. Thompson concluded that she was not Seriously Emotionally Disturbed. He did agree with Dr. Hoover, however, that she had Oppositional Defiant Disorder and Parent/Child Problems. (*See id.*) He thought that the Johnsons ought to resume family therapy and that Tiffiney had the potential to learn to control her impulses and develop improved problem-solving strategies. (*See id.*)

On 11 June 1996, the M–Team met again. The M–Team determined that Tiffiney was not eligible for special education services under Rule 05 20–1–3.09 of the Rules and Regulations provided by the Department of Education. (*See* Pl.'s Ex. 1–E.) On 21 June 1996, Metro Schools denied the Johnson's request for an independent evaluation of Tiffiney. (Tr. at 246–48; Ex 1–E.)

After the M–Team's initial determination and prior to the due process hearing, Petitioner apparently saw three different

mental health specialists: Drs. Carol Hersh, Pamela Auble, and Judith Kaas Weiss. On 26 June 1996, Dr. Hersh began treating Tiffiney and provided an initial psychiatric evaluation. (Pl.'s Ex. 1–H, Subex. 2; Hersh Depo. at 11.) After noting that Tiffiney appeared of about average intelligence, Dr. Hersh recorded the following impressions:

| | | |
|---|---|---|
| AXIS I: | 1. | OPPOSITIONAL DEFIANT DISORDER |
| | 2. | PARENT–CHILD PROBLEM |
| | 3. | R/O ANXIETY DISORDER |
| AXIS II: | DEFERRED | |
| AXIS III: | NONE KNOWN | |
| AXIS IV: | STRESSOR MODERATE (school problems, conflict with parents) | |
| AXIS V: | GAF 66/55 | |

(*Id.*) Dr. Hersh noted that Tiffiney did not need medication at that time; that she did not fit the definition of SED; that the Johnsons needed family counseling; and that Tiffiney needed individual counseling to help develop coping skills and independence. (*See id.*)

In a June 1997 deposition, Dr. Hersh indicated that she thought that the Johnsons were substantial contributors to Tiffiney's acting out. (Pl.'s Ex. 1–H, Hersh Depo. at 17.) Dr. Hersh indicated that the parents set polar opposite limits for Tiffiney—Mr. Johnson setting extraordinarily difficult limits for any adolescent and Mrs. Johnson finding it difficult to set any limits—and that they seemed to use Petitioner as a weapon against each other. (*See id.* at 16–17.) Dr. Hersh noted that Tiffiney seemed vulnerable to this type of environment, but she did not know why. (*See id.* at 17.) She thought that the parental problems contributed more to Tiffiney's acting out than they did to her poor performance in school, although they contributed to the latter issue as well. (*See id.*)

Additionally during this deposition, Dr. Hersh acknowledged that her assessment had changed since June 1996 when she did not believe Tiffiney's history was consistent with a diagnosis of ADD or ADHD. (*See id.* at 19.) By 1 May 1997, Dr. Hersh had concluded that ADD or ADHD was a reasonable diagnosis. (*See id.* at 20.) This change in diagnosis resulted from Tiffiney's positive (if not overwhelming) response to Ritalin treatment. Dr. Hersh conceded that providing an absolutely certain diagnosis was difficult:

> [Stating with certainty what Tiffiney suffers from] is difficult, because most of what we do in this business is not something that is absolute. It is one of the difficulties with psychiatry. There is no test that will answer this question.
>
> Absolutely positive, Oppositional Defiant Disorder. Absolutely positive, parent/child problems. Possible, but not absolutely positive, Attention Deficit Disorder and Generalized Anxiety Disorder, and possible but not absolutely certain, Personality Disorder.

(Ex 1–H, Hersh Depo. at 23.) Hersh felt that Tiffiney needed a structured environment where limits are consistently set and Tiffiney would be stimulated to grow and become independent. (*See id.* at 23–24.) Dr. Hersh thought that the Benton School program had been good for Tiffiney; in particular, the "relatively small class size, close supervision, personal involvement of the staff with the patients, consistent limit setting, the ability to set limits, not only consistently but appropriately and with humanity." (*Id.* at 33.) Dr. Hersh also noted that Tiffiney would benefit from behavioral modification programs both at school and at home, (*see id.* at 39), and that she was more likely to have an unacceptable or unusual emotional or behavioral response to a given situation, (*see id.* at 44).

On 16 November 1996, Dr. Judith Kaas Weiss evaluated Tiffiney. (*See* Pl.'s Ex. 1–G.) Dr. Weiss concluded that her evaluation supported "attentional deficit with hyperactivity" and "a significant behavior disorder." (*id.* at 7.) Dr. Weiss also noted the possibility that a diagnosis of reactive attachment disorder might be appropriate. (*See id.*) At the hearing in July 1997, Dr. Weiss stated, "I think [Tiffiney] is one of the most disturbed children that I have ever seen in 35 years." (Tr. at 75.) She noted that Tiffiney had several disabilities, "[S]he does have some learning disability.

She does have some neurotransmitter problems that are being expressed as Oppositional Defiant Disorder and Attention Deficit Disorder and Hyperactivity, but I think it goes beyond that." (*Id.*) Dr. Weiss also testified at the hearing that she felt Tiffiney exhibited inappropriate feelings under normal circumstances. (*See* Tr. at 77–78.) Additionally, she felt that such inappropriate behavior and feelings impacted her performance at school, e.g., she was expelled from school. (*See* Tr. at 78.) She also opined that Tiffiney's Reactive Attachment Disorder and Oppositional Defiant Disorder would adversely impact her educational performance in the future. (Tr. at 80–81.) Dr. Weiss further opined that Tiffiney needed an educational environment in which her teachers are compassionate and have a lot of patience, but that a program of behavior modification would fail because of Tiffiney's impulsiveness. (Tr. at 84–85.) She thought that Tiffiney would need to be in a classroom with fifteen students and a teacher and teacher's aide or in a classroom with fewer than fifteen students. (Tr. at 86.) Additionally, Dr. Weiss thought that Tiffiney needed medication and probably needed to be in a 24–hour intensive therapeutic situation. (Tr. at 85.) Dr. Weiss felt that it would be impossible to educate Tiffiney in a normal classroom. (Tr. at 95–96.) Dr. Weiss also testified that she thought Tiffiney was a sociopath. (Tr. at 128–29.) Dr. Weiss did not think that Tiffiney's problems were the result of a dysfunctional family or inadequate parenting; rather the family's problems resulted from Tiffiney's problems. (Tr. at 130–31.)

On 26 March 1997, Pamela Auble, Ph.D., evaluated Tiffiney based on a referral from the Vanderbilt Legal Clinic. (Pl.'s Ex. 1–F.) In the report based on this evaluation, Dr. Auble concluded that Tiffiney was "suffering from an attention deficit/hyperactivity disorder, an oppositional defiant disorder, and a parent-child problem." (Ex 1–F at 10.) She also noted that Tiffiney exhibited some characteristics that were consistent with borderline personality disorder, but it was difficult to diagnose such

a disorder until after Tiffiney matured through adolescence. (*See id.*) Additionally, Dr. Auble noted her failure to see consistent evidence of reactive attachment disorder or of learning disabilities. (*See id.*) Dr. Auble opined that Tiffiney should continue in small classrooms and in individualized instruction to obtain maximum benefit from school. (*See id.*) Additionally, family counseling was recommended. (*See id.*) Dr. Auble thought that Tiffiney did not meet the criteria for certification as Seriously Emotionally Disturbed. (Pl.'s Ex. 1–F at 11.) She acknowledged that Tiffiney had a history of and continued to engage in inappropriate behavior, but that she did not believe that Tiffiney's behavior was a manifestation of a disturbing internal emotional state or a misperception of the environment. (*See id; see also* Tr. at 312.)

When Dr. Auble testified at the due process hearing, she stated that Tiffiney's ADHD would have to be classified as mild due to the extent of the disagreement over the diagnosis, e.g., Drs. Thompson and Tramontana, did not diagnose it and Drs. Blair and Hersh did not make firm diagnoses. (Tr. at 306.) In response to a question of whether Tiffiney needed special education services, Dr. Auble replied, "[B]ecause of her Attention Deficit Disorder, it is my opinion that she needs small class size and individualized instruction and that can help her obtain the maximum benefit from school." (Tr. at 313; *see also* Tr. at 325.) According to Dr. Auble, the Johnsons' family problems did affect Tiffiney's acting out. (Tr. at 314.) Dr. Auble indicated that she disagreed with Dr. Weiss's conclusions that Tiffiney is Seriously Emotionally Disturbed, (*see* tr. at 317); that she has Reactive Attachment Disorder, (*see id.*); and that she has a learning disability, (*see* tr. at 319). Dr. Auble did agree with Dr. Weiss's opinion that Tiffiney has ADHD. (*See id.*) Dr. Auble did note that Tiffiney exhibited some traits that would support Dr. Weiss's diagnosis that Tiffiney was a sociopath, but that such a determination was premature

given Tiffiney's age and the fact that her personality was still forming. (Tr. at 320.)

A due process hearing was held on 16th and 17th of July 1997 before Administrative Law Judge William Jay Reynolds. ALJ Reynolds issued his opinion and findings of fact denying Petitioner's claim on 9 December 1997.

Between October 1997 and June 1998, Phyleen Ramage, M.D., treated Tiffiney. Dr. Ramage first saw Tiffiney on 22 October 1997. (Ramage Depo. at 20.) She originally diagnosed Tiffiney with ADHD, but later opined that Tiffiney probably fell within a subset of persons who exhibit ADHD-like symptoms but are actually bipolar. (See id. at 30.) Dr. Ramage said that this diagnosis was verified when she accidentally provided Tiffiney medicine meant to treat her ADHD symptoms but actually precipitated a manic episode. (Ramage Depo. at 31.) It was one of these manic episodes which resulted in Tiffiney's expulsion from Benton Hall. (See id.) Dr. Ramage opined that Tiffiney met the criteria for a finding of Emotionally Disturbed which entitled her to additional assistance with school and placement.[1] (See Ramage Depo. at 42.) Additionally, Dr. Ramage stated that Tiffiney was the most impulsive person she had ever met. (Ramage Depo. at 49.) She stated that after Tiffiney was hospitalized for a second time, that Tiffiney was suffering from an inability to learn and that she would require tight supervision, frequent redirection, and a lot of structure. (See Ramage Depo. at 54.) Dr. Ramage also detailed behavior that supported her diagnosis of bipolar. This includes extremely impulsive behavior, such as sitting in a car at a stop light and striking up a conversation with a man in the next car, chasing a car that cut her off in traffic onto a dark road, running away to Florida with a guy she barely knew, and having a loaded gun at school for no apparent reason. (Ramage Depo. at 66–68.) Dr. Ramage noted that she did not notify anyone of her diagnosis of bipolar disorder until 23 January 1998. (See id. at 89.)

After Tiffiney's expulsion from Benton Hall, she enrolled in Williamson County's Page High School. (See DE 19, Pl.'s Ex. D.) The Williamson County M–Team determined that Tiffiney was eligible for special education because she was Emotionally Disturbed and had a learning disability. (See id.) This M–Team concluded that she met the state criteria and that her needs could not be met in the regular program without special education. (See id.)

In June 1998, Tiffiney was admitted to the New Life Lodge for substance abuse treatment. (DE 19, Ex C.) The psychological evaluation performed by Mary Kathryn Black, Ph.D., on Tiffiney indicated polysubstance abuse, ADHD (combined type), and anxiety disorder.[2] (DE 19, Pl.'s Ex. C.) The psychologist did estimate that Tiffiney's intelligence to be within the range of average to high average. (See id.)

### DISCUSSION

#### General Info re the IDEA

One of the several purposes served by the Individuals with Disabilities Education Act ("IDEA") is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living." 20 U.S.C.A. § 1400(d)(1)(A) (2000). Within this definition, 'special education' means in-

---

1. The designations "Emotionally Disturbed" and "Seriously Emotionally Disturbed" describe the same disability under the IDEA, but the former is now favored as the proper descriptor.

2. It's worth noting that Tiffiney's records from her inpatient stay at Vanderbilt in January 1998 indicate abuse of tobacco, alcohol, and marijuana. It indicates that she had not used cocaine "recently." (DE 19, Ex B). Additionally, her labs on admission to the hospital were unremarkable regarding drug use. (See id.)

struction specially designed to meet the unique needs of a child with a disability at no cost to the child's parents, *see* 20 U.S.C.A. § 1401(25), and 'related services' refers to transportation, and developmental, corrective, and other supportive services required by a child with a disability to benefit from special education, *see* 20 U.S.C.A. § 1401(22).

In reviewing cases brought under 20 U.S.C.A. § 1415(i)(2), the district court is to engage in a two part assessment: (1) whether the state has complied with the IDEA's procedural requirements and (2) whether the resulting individualized educational program is reasonably calculated to enable the child to receive educational benefits. *Burilovich v. Board of Education of Lincoln Consolidated Schools*, 208 F.3d 560, 565 (6th Cir.2000) (citing *Board of Education v. Rowley*, 458 U.S. 176, 206–07, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)). Under both the procedural and substantive reviews, the Sixth Circuit has indicated that a modified de novo review is appropriate. *Burilovich*, 208 F.3d at 565 (citing *Renner v. Board of Educ.*, 185 F.3d 635, 641 (6th Cir.1999); *Metropolitan Board of Pub. Educ. v. Guest*, 193 F.3d 457, 463–64 (6th Cir.1999)). When considering procedural matters, a court "should 'strictly review technical deviations for procedural compliance.' " *Burilovich*, 208 F.3d at 566 (citing *Dong v. Board of Educ.*, 197 F.3d 793, 800 (6th Cir.1999)). Where the procedural requirements are satisfied, the court should give greater deference to the district's placement decision. *Burilovich*, 208 F.3d at 566.

As to substantive issues, the standard of review is a bit more complicated. The *Burilovich* court noted that although the statute requires a court to base its decision on the preponderance of the evidence, *see* 20 U.S.C.A. § 1415(i)(2)(B)(iii), the district court is not "to substitute its own notions of sound educational policy for those of the school authorities which they review," *Burilovich*, 208 F.3d at 566 (quoting *Thomas v. Cincinnati Bd. of Educ.*,

918 F.2d 618, 624 (6th Cir.1990)) (internal quotes omitted). A court should give more weight to the agency's determinations where educational expertise is required. *Burilovich*, 208 F.3d at 567. The deference due the administrative findings, however, is less than that found in the "substantial evidence" standard typically applied to administrative findings. *See id.* Thus, the Sixth Circuit articulated the following standard to be applied by district courts reviewing administrative findings under the IDEA:

> [A]dministrative findings in an IDEA case my be set aside only if the evidence before the court is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both. A court should defer to the administrative findings only when educational expertise is relevant to those findings and the decision is reasonable. By so deferring, "due weight" will have been given to the state administrative proceedings.

*Burilovich*, 208 F.3d at 567. Thus, the *Burilovich* decision seems to instruct district courts to approach an IDEA case from a de novo point of view, except as to those points requiring educational expertise. Where expertise is required, a court should defer to the agency's reasonable decision, even if the court would have decided otherwise on first impression.

*Exhaustion of Administrative Remedies*

As a preliminary matter, Respondent argues that this Court lacks jurisdiction to hear this appeal because Petitioner failed to exhaust her administrative remedies. (Def.'s Brief at 16.) Specifically, Respondent asserts that Petitioner could have filed a motion for reconsideration of the ALJ's decision or could have sought a second due process hearing. The failure of a party to seek reconsideration of a final order is not a prerequisite for seeking judicial review. Tenn.Code.Ann. § 4–5–

317(a). Additionally, Respondent's argument for the possibility of a second due process hearing is premised on its argument that the additional evidence offered by Petitioner raises new issues. As noted below, however, such evidence does not raise additional issues and is admissible only to the extent that it sheds light on the issues before the administrative law judge—specifically, Tiffiney's alleged disability at that time.

*Did ALJ give undue weight to School System's Evidence*

Having established the proper standard of review and this Court's jurisdiction, the next issue is Petitioner's allegation that her due process hearing lacked impartiality. Petitioner argues that the ALJ undermined the impartiality of the due process hearing by giving too much deference to the school system. (Pl.'s Brief at 12.) In support of this claim, Petitioner cites the ALJ's statement, "The Court may not substitute its own notions of sound educational policy for those of the school authorities which they review." (ALJ's Decision at 8; *see also* ALJ's Decision at 17.) Arguing that this statement indicates a lack of impartiality on the part of the ALJ, Petitioner asks that this Court reduce the weight it gives the ALJ's decision. (Pl.'s Brief at 13.)

In response, Respondent argues that Petitioner's position lacks merit because the ALJ's position corresponds precisely with the Supreme Court's holding in *Board of Education of Hendrick Hudson Central School District Westchester County v. Rowley,* 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). Rather than demonstrating partiality, Respondent argues that the ALJ's statement was simply intended to state the law of the land. (Def.'s Brief at 11.)

Petitioner's argument lacks relevance in the context of this case. The ALJ's denial of benefits was premised upon a factual determination that Petitioner did not meet the IDEA's criteria for disability. The school district's educational policy, therefore, never became central to the ALJ's decision.

Moreover, the ALJ did correctly state the current status of the law. The Supreme Court has noted, "[T]he provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley,* 458 U.S. at 206, 73 L.Ed.2d at 712. The Sixth Circuit has held that the review of an individualized educational plan ("IEP") requires the court to "keep in mind that the state and local educational agencies are deemed to possess expertise in education policy and practice." *Burilovich,* 208 F.3d at 567. For this reason, a court is to give greater weight to the agency's determinations which are predicated upon its expertise, although a court should not give these administrative findings the same weight normally accorded administrative decisions. *See id.* at 567 (implicitly equating the state educational agency's view with administrative findings).

■ These directives clearly require district courts to defer to the final state decision—i.e., the final determination of the administrative law judge. For instance, the *Rowley* court provided this admonition while discussing the proper role of the district court when reviewing a case, *see Rowley,* 458 U.S. at 204–06, 102 S.Ct. 3034; and in *Thomas v. Cincinnati Bd. of Ed.,* 918 F.2d 618 (6th Cir.1990), the court noted "the only logical position, under *Rowley* and general principles of administrative law, is that federal courts are required to defer to the final decision of the state authorities, in this case that of the [state level review officer]," *id.* at 624. *Cf.* 20 U.S.C.A. § 1415(i)(2) (granting the right to appeal from the impartial due process hearing). Yet the *Thomas* court also indicated in reviewing a state level review officer's decision, deference must be given to the local school authorities' notion of

sound educational policy. See *Thomas*, 918 F.2d at 627 (reviewing the state level review officer's conclusion under the qualification that "we are not free to substitute our own notion of sound educational policy for those of the local school authorities."). Thus, if the district court is to give deference to the local school authorities on educational policy issues when it reviews the decision from an impartial due process hearing, it can only be that the ALJ presiding over such a hearing must give due weight to such policy decisions. For it to be otherwise, would be illogical; to prevent an ALJ from giving proper deference to the educational expertise of the local school authorities and then require such deference by the district court would be inefficient and thus counter to sound jurisprudence. Thus, although questions of educational policy were not determinative of the dispute at hand, the ALJ's statement of law was proper.

*Submission of Additional Evidence*

 Title 20 United States Code section 1415(i)(2) provides a party aggrieved by the findings of the administrative law judge has the right to bring a civil action in the district court of the United States without regard to the amount in controversy. *See* 20 U.S.C. § 1415(i)(2)(A) (1999). A court thus gaining jurisdiction (1) "shall receive the records of the administrative proceedings"; (2) "shall hear additional evidence at the request of a party"; and (3) "basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B). This language is identical to the language used in the superceded 20 U.S.C. § 1415(e)(2) which was in effect prior to 4 June 1997. *See* 20 U.S.C. § 1400 note (Effective Dates).

The Sixth Circuit has provided guidance to district courts as to when introduction of additional evidence is appropriate. In *Metropolitan Government of Nashville and Davidson County v. Cook*, 915 F.2d 232 (6th Cir.1990), the court stated that

"additional evidence" was not limited to situations such as supplementing or filling in gaps of evidence previously introduced. *See id.* at 234. Rather, the *Cook* court emphasized that "additional" implies something that is to be added, joined, or united; not simply something that supplements. *See id.; see also Metropolitan Board of Public Education v. Guest*, 193 F.3d 457, 463 (6th Cir.1999) (interpreting *Cook*); *Hudson v. Bloomfield Hills Public Schools*, 910 F.Supp. 1291, 1305 n. 16 (E.D.Mich.1995) (stating that *Cook* places the issue of additional evidence "in the sound discretion of the district court"). In *Guest*, a student's parents challenged a proposed IEP for the 1996–97 school year. During the hearing before the district court, the judge admitted evidence arising from events during the 1996–97 and 1997–98 school years. The court noted that such evidence was properly admitted "only for the purpose of deciding whether the proposed IEP for the 1996–97 school year was reasonably calculated to lead to educational benefits." *Guest*, 193 F.3d at 463 (citing *Fuhrmann v. East Hanover Bd. of Educ.*, 993 F.2d 1031, 1040 (3d Cir.1993) (which held, "[E]vidence of a student's later educational progress may only be considered in determining whether the original IEP was reasonably calculated to afford some educational benefit.")). Thus, it appears that the Sixth Circuit applies a fairly liberal standard for the admittance of evidence to the extent that it sheds light on the reasonableness of the original decision, but not if the evidence brings up new issues.

Applying this standard, the Court grants Petitioner's request for the admission of additional evidence—specifically, evidence of Petitioner's subsequent treatment by Dr. Ramage, Petitioner's subsequent educational records, records of Petitioner's treatment at Vanderbilt's Psychiatric Hospital from December 1997 through February 1998, and medical records from Tiffiney's stay at the New Life Lodge. Pursuant to the above pre-

cedent, this Court notes that such evidence is admitted for the narrow and sole purpose of determining whether Tiffiney qualified as disabled at the time of the due process hearing. Thus, subsequent manifestations of disabling traits are relevant only to the extent they confirm that a student was disabled at the time of the final decision. To the extent that the evidence demonstrates a subsequent onset of a disabling condition, it presents a new issue not before the ALJ' and, thus, not ripe for determination by this Court.

Copies of relevant sections of the Administrative Policies and Procedures Manual of the Tennessee Department of Education, Division of Special Education have been admitted without objection by Respondent.

*Did the ALJ correctly determine that Tiffiney failed to qualify as a child with a disability?*

The IDEA provides a two part definition of child with a disability. *See* 20 U.S.C.A. § 1401(3)(A). Thus, Tiffiney qualifies as a child with a disability if she meets the following definition:

[A] child—

(i) with metal retardation, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance (hereinafter referred to as "emotional disturbance"), orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and

(ii) who, by reason thereof, needs special education and related services.

*Id.* The Metro Nashville Public School System provides special education and related services in compliance with the rules and policies of the Tennessee Rules, Regulations and Minimum Standards and the Administrative Policies and Procedures Manual of the Division of Special Education of the State Board of Education ("APPM"). (Pl.'s Ex. 1–A, Part II at 1.) These regulations, policies, and procedures are meant to ensure compliance with the IDEA. (Pl.'s Ex. 1–B at "Acknowledgment.) The APPM requires for a finding of eligibility that the M–Team determine both that the child has a physical and/or mental impairment under the criteria found in the APPM and that due to the disability the child requires special education and related services in order to be educated within the regular school program. (*See* Ex 1–B, APPM, at 36.)

To be a "child with a disability," a child must need special education and related services. "Special education" is defined as "specifically designed classroom instruction or instruction in other settings provided at no cost to the parent to meet the unique needs of an eligible child." (Pl.'s Ex. 1–B, APPM I(1)kk, at 9.) This instruction is substantially identical to the definition of "special education" provided in the IDEA. *See* 20 U.S.C.A. § 1401(25). Federal regulations have further explained "special education" by noting that "specially designed instruction" (which presumably is identical to Tennessee's "specifically designed classroom instruction") means "adapting, as appropriate to the needs of an eligible child under this part, the content, methodology, or delivery of instruction." 34 C.F.R. § 300.26(b)(3). Related services are defined as "transportation and such developmental, corrective and other supportive services as are required to assist an eligible child to benefit from special education." (Ex 1–B, APPM I(1)gg, at 9.) This definition of "related services" is substantially similar to the definition provided by the IDEA. *See* 20 U.S.C.A. § 1401(22); 34 C.F.R. § 300.24(a).

Petitioner proffers two arguments that Tiffiney qualifies for special education. First Petitioner argues that she qualifies under the "other health impairments" prong of section 1401(3)(A) due to her ADD and/or ADHD. (Pl.'s Brief at 14–15.) Second, Petitioner argues that she qualifies as a child with a disability because of

her Serious Emotional Disturbance. (Pl.'s Brief at 18.)

■ Although the ALJ's decision that Tiffiney did not meet the criteria for disability under the IDEA conformed to the preponderance of evidence before him, this Court holds that in light of the additional evidence now before it, that Tiffiney was disabled as of June 1997 when the Respondent made its final determination. The evidence before the court is cloudy; there has been substantial disagreement among the numerous professionals who have evaluated and treated Tiffiney. When considered as a whole—however murky and conflicting—the preponderance of the evidence indicates that Tiffiney then suffered from an Emotional Disturbance as defined under the IDEA.

A finding that a child suffers from an emotional disturbance requires the existence of the following:

> [A] condition exhibiting one of more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance:
>
> (A) An inability to learn that cannot be explained by intellectual, sensory, or health factors.
>
> (B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers.
>
> (C) Inappropriate types of behavior or feelings under normal circumstances.
>
> (D) A general pervasive mood of unhappiness or depression.
>
> (E) A tendency to develop physical symptoms or fears associated with personal or school problems.

34 C.F.R. § 300.7(c)(4); (see also Pl.'s Ex. 1–C, Special Education Manual, at 17.4.) Dr. Ramage's testimony provides the greatest support for a determination that Tiffiney was Emotionally Disturbed. Her

evaluation, furthermore, indicates that many of the traits and concerns raised by other specialists support a finding of emotional disturbance, even though the specialists themselves did not make such a finding.[3]

The evidence before the ALJ was replete with references to Tiffiney's inappropriate behavior under normal circumstances. Despite the examples of inappropriate behavior, most of the evaluators did not find Emotional Disturbance because they concluded that the behavior lacked emotional roots. Dr. Auble testified that based on her review of prior evaluations Tiffiney did engage in inappropriate behavior. (Tr. at 312, 335.) However, she stated that such behavior did not support a finding of emotionally disturbed because it results from a behavioral disorder and is not "a manifestation of a disturbing emotional state or a psychotic process." (Tr. at 312.) Dr. Thompson diagnosed Tiffiney with having a behavioral problem known as "Oppositional–Defiant Disorder." (Tr. Ex 12 at 4.) Dr. Thompson explained that there must be an emotional disorder to go along with abnormal behavior or feelings under normal circumstances to support a finding of emotional disturbance. (Tr. at 428.) Dr. Thompson implied that this underlying emotional disorder was missing from Tiffiney; her behavioral problems were related to social maladjustment, Oppositional Defiant Disorder, and parent-child problems. (Tr. at 429.) And in 1997 Dr. Hersh noted that "Tiffiney's behavior is, in frequent circumstances, unacceptable and somewhat dangerous. Her impulsiveness, whether it is, no matter what it is based on puts her at some risks, and poor judgment does the same." (Hersh Depo. at 38.)

---

**3.** Dr. Weiss's evaluation strongly supports Dr. Ramage's conclusions. Given, however, the ALJ's determination that Dr. Weiss's testimony lacked credibility and this Court's agreement with the ALJ's finding due to the advocate-like tenor of her testimony, the Court has chosen not to rely on her testimony for its conclusion.

Dr. Ramage's testimony, however, indicated that Tiffiney's behavior was, indeed, related to an underlying emotional disorder. She testified that Tiffiney had many traits that were consistent with ADHD, but that in actuality she was bipolar. (Ramage Depo. at 29–30.) She testified, "[T]here are a subset of children who look very ADHD-like as little kids, who don't respond well to typical ADHD interventions, behavioral, educational, medication, maybe, who if you follow them into adulthood they were not probably ADHD at all. They were probably bipolar." (*Id.* at 30.) This sequence of events aptly describes Tiffiney's situation. As early as 1989, Dr. Blair indicated that Tiffiney suffered from attention deficit disorder. (Tr. Pl.'s Ex. 2, Blair's Report at 5.) In December 1993, Dr. Tramontana characterized Tiffiney as distractible and impulsive, but noted that his findings "were not entirely consistent with ADHD." (Tr. Pl.'s Ex. 13.) He concluded, however, that Tiffiney required services in school that "most closely resemble the needs of an ADHD child." (*Id.*) By 1997 Dr. Hersh noted that a diagnosis of ADHD was reasonable given Tiffiney's positive, although not, overwhelming response to Ritalin. (Tr. Pl.'s Ex. 1–H, Hersh Depo. at 20.) Dr. Blair also indicated that she thought Tiffiney suffered from ADHD, despite qualifying the diagnosis as mild ADHD in deference to the conflicting evaluations of Tiffiney. (*See* Tr. at 313, 326.) Thus, Tiffiney fits the profile described by Dr. Ramage: ADHD-like symptoms which do not respond well (although somewhat positively) to typical treatment such as Ritalin.

When the observations of Tiffiney's inappropriate behavior are combined with Dr. Ramage's persuasive diagnosis of bipolar disorder and opinion that her behavioral patterns result from this disorder, (*see* Ramage Depo. at 47), Tiffiney clearly demonstrates one of the characteristics indicative of an emotional disturbance. To qualify as Emotionally Disturbed, however, Tiffiney must have exhibited such inappropriate behavior over an extended period of time to a marked degree and such behavior must have adversely affected her educational performance, *see* 34 C.F.R. § 300.7(c)(4); (*see also* Pl.'s Ex. 1–C, Special Education Manual, at 17.4). The first two criteria, the (1) exhibition of the behavior to a marked degree and (2) over a long period of time, are not seriously contested. Certainly, the record demonstrates severe behavioral problems over the course of Tiffiney's lifetime. The parties do dispute whether such behavior has adversely affected Tiffiney's educational performance.

The Special Education Manual of Tennessee discusses the meaning of adverse effect on educational performance and notes that it "pertains to the child's diminished academic performance in the classroom, impaired school learning experience, and/or failure to master skill subjects." (Tr. Pl.'s Ex. C at 17.3.) The problems caused by emotional disturbance must be "significant enough to require interventions that cannot be provided without special education services." (*Id.*) Additionally, the manual notes that if the student is "making reasonable progress and their needs can be accommodated within regular education, the special education services should not be provided to theses students." (*Id.* at 17.3–17.4.)

Respondent correctly notes that the record indicates in many ways that Tiffiney is making reasonable progress in school. Her grades have been satisfactory in most cases, although it does appear that she performed better and more consistently at Benton Hall. (Tr. Pl.'s Ex. 7.) The problem, therefore, is not so much Tiffiney's lack of performance but that she has been unable to remain in school. (*See* Ramage Depo. at 70.) She has been expelled from both Goodpasture and Benton Hall. This inability to remain in school while in a regular school environment—or even the more controlled environment of Benton Hall—indicates that Tiffiney's needs were not accommodated within the regular edu-

cation system. Thus, Tiffiney was eligible for special education services under the IDEA due to her Emotional Disturbance.

*Remedy*

Petitioner seeks reimbursement of tuition and transportation as well as reimbursement for the independent educational evaluation. (Pl.'s Brief at 20, 23.) A district court reviewing a state's administrative decision under the IDEA, "shall grant such relief as the court determines is appropriate." 20 U.S.C.A. § 1415(i)(2)(B)(iii). The Supreme Court has noted that equitable considerations are appropriate in determining relief and that a court enjoys broad discretion in this determination. *See Florence County v. Carter,* 510 U.S. 7, 16, 114 S.Ct. 361, 126 L.Ed.2d 284, 294 (1993) (citing *School Comm. of Burlington v. Department of Ed. of Mass.,* 471 U.S. 359, 374, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985)).

*—Reimbursement for Tuition Expenses*

■ In *Burlington* the Court noted that the IDEA does authorize district courts "to order school authorities to reimburse parents for their expenditures on private special education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act." *Id.,* 471 U.S. at 369, 105 S.Ct. at 2002, 85 L.Ed.2d at 395. The Supreme Court has since expanded this holding, noting that the parents' failure to place a student in a school "known to be approved by the State in favor of an unapproved option is not itself a bar to reimbursement." *Florence County,* 510 U.S. at 14, 126 L.Ed.2d at 293. Parents who unilaterally change their child's placement during a pending review do so at their own risk. *Id.,* 510 U.S. at 15, 126 L.Ed.2d at 294 (citing *Burlington,* 471 U.S. at 373–74, 85 L.Ed.2d 385). Such parents are entitled to reimbursement *"only* if a federal court concludes both that the public placement violated IDEA and that the private school placement was proper under the Act." *Florence County,* 510 U.S. at 15, 126 L.Ed.2d at 294 (emphasis original).

In this case, Petitioner's parents did not remove her from a public school setting; rather, her parents placed her in a private school and then sought an eligibility determination under the IDEA. Respondent contends that because the educational services provided Petitioner by Benton Hall were not rendered under the IDEA, that such services cannot be reimbursed. The *Florence County* decision implies that the query is not whether the services rendered had been given the imprimatur of the State or were given under the IDEA, but whether the services provided Petitioner with an appropriate education—that is, the instruction would have been proper under the IDEA. In addition, the Sixth Circuit has noted that when a court must choose between a school board's inaction and a placement that may violate the IDEA but that satisfies a student's much needed educational needs, a court may reimburse parents for the latter choice. *See Babb v. Knox County School System,* 965 F.2d 104, 108 (6th Cir.1992). The evidence indicates that Benton Hall attempted to provide Petitioner with the education that she required—a well structured environment with small class sizes and individualized attention. (*See* Ex. 1–H, Hersh Depo., at 33; Ex. 1–F, Auble Evaluation, at 10; Ramage Depo. at 54.) Although Respondent indicates that they could have supplied this very same type of educational environment absent a finding of eligibility under the IDEA for special education services, e.g., under a section 504 plan, nothing in the record indicates that Tiffiney was immediately to receive such services is she had enrolled with Respondent. The M–Team did not recommend a section 504 plan for Tiffiney or indicate anything out of the ordinary would be done for her. Thus, Petitioner's parents were left with the decision of placing Tiffiney in a private school where she would be educated in a highly .structured environment or place Tiffiney with Respondent where there was no guarantee as to the services she would be given. *Babb* indicates that Respondent's

objection falls short. Petitioner is entitled to reimbursement.

Petitioner seeks tuition and travel expenses for both her 1995–96 and 1996–97 school years at Benton Hall School. Equity requires an award of tuition only for the 1996–97 school year. Petitioner did not ask for special education assistance from Metro Schools until 7 December 1995. (Tr. at 235.) This request came after Tiffiney had already enrolled in Benton Hall. On 23 January 1996, Ms. Johnson asked for an educational evaluation of Petitioner, (*see* Pl.'s Ex. 1–E); Respondent completed its M-team evaluation on 11 June 1996, (*see* Pl.'s Ex. 1–E). Equity prevents reimbursement of costs accrued prior to Metro having a chance to evaluate Tiffiney and determine what was best for her—particularly where the record does not indicate that the Johnsons provided Metro with the opportunity to educate Tiffiney. Thus, Petitioner is entitled to reimbursement for the $7000.00 they paid in tuition for the 1996–97 school year and the $140 they paid in transportation costs during that year.

—*Reimbursement for Independent Evaluation*

■ Petitioner also seeks reimbursement for an individualized evaluation by Dr. Weiss. Tennessee Rule 0520–1–3.09(5)(d)(1) requires Respondent to pick up the tab for Dr. Weiss's evaluation in the following circumstances:

i. if the parent gives notice of disagreement with the evaluation provided by the school system; or

ii. if the parent gives notice of disagreement with the evaluation provided by the school system and the school system disagrees with the parent and the school system initiates a hearing and the hearing officer decides that the parent was correct.

(*See* APPM § 5(d)(1) at 97–98.) It is clear that Ms. Johnson disagreed with the evaluation provided by the school system, requested an independent evaluation, and

that Metro initiated a due process hearing for purposes of supporting its evaluation. (*See* 21 June 1996 Letter from Thelma Givens to the Johnsons.) For reimbursement to be proper, Dr. Weiss' evaluation must meet the criteria set by Metro for their own assessments, including Dr. Weiss' qualifications. (*See* APPM, § 5(d)(3), at 98.) The record does not indicate the required criteria for such evaluations, so this Court is unable to determine whether Dr. Weiss' evaluation sufficiently met the required standards. Given the advocate-like nature of her testimony and the ALJ's finding that her testimony lacked credibility, this Court is reluctant to award the costs of her evaluation to Petitioner. Thus, pending submission of evidence proving that Dr. Weiss' evaluation complied with Metro guidelines, Petitioner's request for reimbursement for the assessment is denied.

## CONCLUSION

For the reasons stated above, the Court GRANTS Petitioner's request to submit additional evidence for the limited purpose of establishing that she was disabled as determined by the IDEA at the time of her due process hearing; GRANTS Petitioner's Motion for Judgment on Appeal; and AWARDS Petitioner her tuition expenses for the 1996–97 school year at Benton Hall School.

An appropriate ORDER will enter.

## *ORDER*

For the reasons set forth in the accompanying Memorandum, the Court GRANTS Tiffiney Johnson's ("Petitioner") request to submit additional evidence for the limited purpose of establishing that she was disabled as determined by the Individuals with Disabilities Education Act ("IDEA") at the time of her due process hearing; finds that Plaintiff qualified as Emotionally Disturbed under the IDEA and GRANTS Plaintiff's Motion for Judgment on Appeal; and AWARDS Plaintiff

her tuition expenses for the 1996–97 school year at Benton Hall School.

It is so ordered.